OPINION OF THE COURT
David B. Saxe, J.
INTRODUCTION
Once again, owners of buildings containing single-room occupancy (SRO) units,[1] challenge legislation which attempts to lessen the growth of the homeless population in the City of New York by prohibiting the conversion, alteration or demolition of privately owned SRO buildings.[2]
The issue that I must decide is whether the buy-out, replacement and hardship exemptions contained in this new *98 legislation (Local Laws, 1987, No. 9 of City of New York)[3] cure the constitutional infirmities of its predecessor (Local Laws, 1986, No. 22) which I invalidated in Seawall Assocs. v City of New York (134 Misc 2d 187) (Seawall I).

[6]

A brief recounting of the legislative history is necessary. Since 1985 the New York City Council has enacted several local laws designed to halt the decline of SRO housing. In July 1986, the City Council by enacting Local Laws, 1986, No. 22 of the City of New York[4] extended the moratorium initiated by Local Laws, 1985, No. 59 of the City of New York which prevented the demolition or alteration of most SRO buildings.[5] However, Local Law No. 22 in addition to providing for a moratorium on the alteration, conversion or demolition of SRO buildings also imposed an affirmative obligation upon SRO owners to rent these units[8] and to maintain them in habitable condition. In addition, if the units were in disrepair, owners would be required to renovate them.[7] Local Law No. 22 applied only to privately owned buildings. Those buildings owned in rem by the City of New York were exempt from the requirements of this law.[8]
When Local Law No. 22 was enacted, certain SRO building owners sought a preliminary injunction staying the enforcement of the law. The plaintiffs argued that Local Law No. 22 violated their constitutional right to due process of law and sought to enjoin its enforcement. In Seawall I (supra) I held that the antiwarehousing regulations contained in Local Law No. 22 were "unreasonable and arbitrary” frustrating "plaintiffs’ property rights without due process of law.” (Supra, at 197.) I also found that Local Law No. 22 took away all development rights of property owners by requiring that they invest thousands of dollars to rehabilitate the SRO units. Moreover, I noted that it was constitutionally suspect to require "owners to be in a business in which they had no intention, expertise or expectation of being involved in.” (Supra, at 195.) Therefore, I granted a preliminary injunction preventing enforcement or implementation of those aspects of *99 the law which required SRO owners to invest substantial amounts of money to rehabilitate their units and to rent them to tenants. The granting of this relief was premised upon a violation of due process rights of SRO owners amounting to irreparable injury.
On February 2, 1987 the City Council enacted a new law, Local Laws, 1987, No. 1 of the City of New York.[9] Thereafter, several amendments to that law were approved and on March 5, 1987 the provisions of Local Law No. 1, as amended, were enacted as Local Laws, 1987, No. 9 of the City of New York.[10] Local Law No. 1 continued the moratorium prohibiting conversions, alterations or demolition of SRO dwellings for a period of five years with extensions of additional five-year terms.[11] It also contained a provision requiring, as of May 1, 1987, all SRO owners to make these units habitable and to rent them to bona fide tenants.[12] An owner was presumed to be in violation of the antiwarehousing provisions if the unit was not occupied by a bona fide tenant for a period of 30 days or longer. The antiwarehousing provisions did not apply to: (1) SRO units with 24 or less units; (2) units which had been declared unsafe; (3) owners who had obtained special permits; (4) any hotel which during the 12-month period commencing January 1, 1984 had 90% or more of its dwelling units occupied for less than 30 consecutive days by one occupant and in which there were no units subject to rent stabilization; (5) SRO owners who arranged for buyouts; or (6) SRO owners who applied for a reduction in the buy-out amount or took advantage of the replacement provisions.[13]
The differences between Local Law No. 22 and the law under challenge, Local Law No. 9, is primarily in three areas: (1) the addition of a cash buy-out provision; (2) the obligation of SRO owners to create replacement housing; and (3) a hardship "escape” provision. The law still contains the anti-warehousing provisions which I previously held to be unconstitutional.
THE BUY-OUT EXEMPTION
Local Law No. 9 currently provides that an SRO owner has *100 the option of either paying $45,000 per SRO unit or "such other amount which the commissioner of housing preservation and development determines by regulation would equal the cost of creating a dwelling unit * * * to replace such single room occupancy dwelling unit”, in order to be exempt from the moratorium. The funds are to be collected and,administered by a newly created SRO Development Fund. These moneys are to be used to preserve, acquire and develop low and moderate income housing throughout New York City. Local Law No. 9 changes the buy-out exemption contained in Local Law No. 1 by providing that where 50% or more of SRO units are occupied as of January 20, 1987 the owner "shall be required to provide for replacement units” approved by the Commissioner.[14] (Emphasis added.) This mandatory replacement plan also requires "either for the sale or net lease of the multiple dwelling containing such dwelling units to a not-for-profit organization or for such other form of transfer of ownership, management or possession of such multiple dwelling approved by [the] commissioner.”[15]
THE REPLACEMENT EXEMPTION
The replacement multiple dwelling "shall include but not be limited to a 'single room occupancy multiple dwelling.’ In the event that an existing multiple dwelling is acquired for the purpose of providing replacement units, such multiple dwelling shall be located in the same or adjacent community board in which the single room occupancy multiple dwelling which is to be altered, converted or demolished is located.”[16] Replacement may be achieved by the acquisition of a multiple dwelling, the substantial rehabilitation of existing dwelling units or by the creation of dwelling units by construction of new multiple dwellings.
THE HARDSHIP EXEMPTION
The amount of the payment required ($45,000 per unit) or the number of dwelling units provided may be reduced in whole or in part by the Commissioner of Housing Preservation and Development if the owner shows that the property yields *101 a reasonable rate of return.[17] The SRO owner would have to establish at an administrative hearing that there is "no reasonable possibility” of making "a reasonable rate of return”. (Administrative Code of City of New York § 198.2 [d] [4] [b] [i].) Reasonable rate of return is defined as "a net annual return of eight and one-half percent of the assessed value of the subject property without recourse to the alteration, conversion or demolition prohibited by [this law].”[18] In order to claim this exemption, the SRO owner must not have intentionally mismanaged the property thereby impairing its ability to earn a reasonable rate of return.
In fact, since all the parties seek dispositive legal relief, I will treat the plaintiffs’ motions as seeking an order of summary judgment.
The underlying complaints which form the basis for declaratory and injunctive relief all assert the same arguments regarding the alleged invalidity of Local Law No. 9. Plaintiffs contend that (1) the city failed to consider the environmental impact of Local Law No. 9 on existing population concentrations and its noncompliance with the State Environmental Quality Review Act (SEQRA), the City Environmental Quality Review Act (CEQR) and the Environmental Conservation Law (ECL); and (2) Local Law No. 9 is an unlawful tax and is arbitrary, confiscatory and in violation of the Due Process and Takings Clauses of the US and NY Constitutions.
The plaintiffs seek to enjoin the enforcement of Local Law No. 9 also on the ground that it has unconstitutionally deprived them of developmental opportunities for their property by preventing demolition of existing buildings thereby impeding opportunities which would yield substantial profits.
I find, therefore, that an environmental review was not required prior to the enactment of Local Law No. 9 because the legislation only contemplated the continued use of existing structures in a manner consistent with current land use regulations. The plaintiffs have failed to show that Local Law No. 9 is the sort of "action” contemplated by the State and city environmental laws.
THE CONSTITUTIONAL CHALLENGE
When reviewing the constitutionality of a statute, a court *102 starts with the proposition that every law has a strong presumption of constitutionality which should be discarded only as a last resort. (Defiance Milk Prods. Co. v Du Mond, 309 NY 537 [1956].) However, it is established that when the validity of a law is challenged it is the duty of a court to determine its constitutionality and to set aside any statute which violates the provisions of the Constitution. (Colon v Lisk, 153 NY 188 [1897].)
Property interests are protected against governmental interference by two provisions of the United States Constitution: (1) the Due Process Clause of the Fifth and Fourteenth Amendments and (2) the "Takings” or Just Compensation Clause of the Fifth Amendment. The constitutional requirement of due process of law is applicable to the States through the Fourteenth Amendment whereas the Fifth Amendment is applicable only to Federal actions. The Fifth Amendment’s Just Compensation Clause was made applicable to the States through the Fourteenth Amendment.[21] The New York State Constitution declares that no person shall be deprived of his property without due process of law (NY Const, art I, § 6) and that private property may not be taken without just compensation (NY Const, art I, § 7 [a]). Moreover, under a State’s Due Process Clause a court may impose a higher standard of constitutional protection than that required of the Federal Government. (People v Isaacson, 44 NY2d 511 [1978].)
A State normally cannot require an owner to use his property for the benefit of others or for the public in general or to restrain an owner from devoting it to any legal purpose so long as such use does not conflict with the rights of others. (People v New York Carbonic Acid Gas Co., 196 NY 421.) However, under appropriate circumstances a State may regulate the use to which private property is put for the health, safety and welfare of the public. Nevertheless, a regulation ostensibly enacted under this aspect of State authority, known as the police power, may so severely restrict the enjoyment of an individual’s property rights as to amount to a taking for which compensation must be paid.
The point at which the police power interferes with property rights and becomes a taking cannot be precisely defined. That examination necessarily requires a weighing of private *103 and public interests. (Webb’s Fabulous Pharmacies v Beckwith, 449 US 155 [1980].) While property may be regulated to a certain extent, if regulation goes too far it will be considered a taking. (Lutheran Church v City of New York, 35 NY2d 121 [1974].) In Lutheran Church, a religious corporation owned and used a former mansion for its own offices. The building was no longer adequate for its needs so it sought to demolish the building and erect an office building at the site. However, the Landmarks Preservation Law prohibited its demolition and replacement. No compensation was provided for this economic hardship to the religious corporation. The Court of Appeals granted a judgment declaring that this "landmark designation” amounted to a void and unconstitutional confiscation of the corporation’s property. (US Const 5th, 14th Amends; NY Const, art I, §§ 6, 7.) The court quoted its prior holding in Forster v Scott (136 NY 577) by stating that " '[i]t is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment or the power of‘disposition at the will of the owner’ ”. (Lutheran Church v City of New York, supra, at 130.)
In French Investing Co. v City of New York (39 NY2d 587, cert denied 429 US 990 [1976]) the Court of Appeals analyzed a zoning resolution which made once privately owned parks located in the mid-Manhattan residential complex of Tudor City into public parks. The landowner intended to develop the park for real estate projects, a right which existed under law. The new zoning resolution extinguished that right by prohibiting building over these parks. Instead, the law permitted the transfer of developmental rights to other lot locations. The plaintiffs in French challenged the rezoning as an unconstitutional taking. Although the court denied the takings claim it held that the law frustrated the plaintiff’s legitimate property rights and expectations for use and therefore constituted a deprivation of due process rights. As such, the regulation was invalidated. Therefore, according to the Court of Appeals, a regulation may violate due process and not constitute a taking (French Investing Co. v City of New York, supra) or it may constitute both. (Lutheran Church v City of New York, supra.)
A DUE PROCESS ANALYSIS
The plaintiffs’ central argument is that Local Law No. 9’s *104 additional provisions and the continuation of the invalid antiwarehousing portions of the law frustrate its property rights without due process of law. Defendants and intervenors argue that Local Law No. 9, which superseded Local Law No. 22, responds to the same issues as the former law, namely, the continued loss of SRO housing and the concomitant increase in homelessness of former tenants. The defendants urge this court to uphold the new law as constitutionally proper, arguing that Local Law No. 9 considers the rights of property owners and balances them with the needs of tenants as well as providing property owners with a means to escape the acknowledged burdensome aspects of the law.
Do the exemptions that have been added to the law enable the statute to comport with due process standards? I find that the exemptions do not alleviate the constitutional difficulties found in the prior law; they only enlarge them. The statutory cash buyout, in the amount of $45,000 per unit, which would entitle the owner to remove the unit from the market, constitutes an excessive financial burden. SRO owners must pay $45,000 to the New York City SRO Development Fund under two circumstances: (1) when the owner persuades a tenant to move[22] and (2) when there is a vacant unit which the owner seeks to recover and remove from the market. This statutory buyout is unrelated to land value. The payment may be adjusted downward in the Commissioner’s discretion and is apparently related to the assumed cost of building replacement units. However, plaintiffs persuasively argue that even assuming the landowner can ultimately vacate an entire building, the statutory buyout and the privately negotiated fee between tenant and property owner would increase land costs to such a degree that it would render this statutory buy-out option economically unfeasible and illusory. Moreover, this buy-out provision is limited to SRO dwellings where less than 50% of the SRO units were occupied as of January 20, 1987; where a building has 50% or more of the units occupied, the statutory cash buy-out option is foreclosed to the owner.
Plaintiff Testamentum’s situation is a prime example of the ironic aspects of the law. Testamentum is a subsidiary of Covenant House, a recognized child-care agency which provides shelter to homeless and neglected children in New York *105 City. Testamentum’s president, Reverend Bruce Ritter, has submitted an affidavit in support of the application for a preliminary injunction restraining the city from enforcing Local Law No. 9. He states that the Times Square Hotel was acquired "in the hope of providing the cornerstone of an endowment to secure the financial future of Covenant House.” In acquiring the property, Reverend Ritter asserts that the plaintiff arranged for financing to upgrade the hotel rooms to increase the hotel’s transient business until disposition or redevelopment of the site. Testamentum is one of the plaintiffs which are foreclosed from using the buy-out option and instead is relegated to the mandatory replacement plan unless hardship can be shown. Ironically, Testamentum itself, a not-for-profit organization, may ultimately be forced to sell or net lease the building to another not-for-profit corporation.
Moreover, Testamentum, although sympathetic to the rationale behind the enactment of this SRO legislation, contends that its provisions are unconstitutional. Testamentum also persuasively argues that the only available options for withdrawal of the building from the moratorium are so costly, burdensome and vague as to violate due process and constitute a taking.
Plaintiffs also argue that the cost of the buy-out exemption is tantamount to an illegal tax and would constitute a due process violation. Plaintiffs’ argument that the $45,000 per unit buy-out exemption is an illegal tax is without merit. Taxation is the power by which a sovereign raises revenue to defray necessary expenses of government. Such charges are exacted for public purposes and are of an involuntary nature.[24] However, here, the money to be contributed to the SRO Housing Development Fund Company is in the nature of a regulatory fee since the money will not be used for the general support of the government, but will be earmarked to develop low-income housing to replace those units altered or demolished by SRO owners. Moreover, the fee is a voluntary means to escape the regulatory scheme.
However, whether the $45,000 buy-out exemption is classified as a tax or a regulatory fee, it clearly extracts an exorbitant price for recovery of an owner’s property. The record demonstrates that such a cost per unit can be prohibitive and realistically prevent SRO owners from recovering the *106 use of their property. Plaintiff Seawall submits an affidavit stating that it spent $5,810,000 to acquire its assemblage before the effective date of Local Law No. 22. Seawall claims that it expended thousands of dollars in relocation expenses to former tenants of its buildings for the purpose of obtaining a voluntary surrender of their units so that it would be able to construct a commercial office building at that site.
The defendants claim that similar regulatory schemes have been upheld in other States. They contend that since the antiwarehousing law enacted in Hoboken, New Jersey, has been upheld by a Federal court, this court should similarly uphold Local Law No. 9. Help Hoboken Hous. v City of Hoboken (650 F Supp 793 [D NJ 1986]) concerned a city ordinance which was enacted to ease the housing shortage in Hoboken. The ordinance required property owners to rent their vacant units within 60 days of the end of the preceding tenancy as opposed to 30 days in the New York law. However, this is where the similarity ends. Unlike New York, New Jersey law authorizes the eviction of statutory tenants where the owner "seeks to retire permanently the residential building * * * from residential use”. (NJ Stat Annot § 2A:18-61.1 [h].) So, the ability of Hoboken property owners to permanently retire their units from residential use if authorized or to redevelop their property as cooperatives or condominiums is left intact. Moreover, all property owners are required to shoulder this obligation unlike the situation existing as a result of New York law where only SRO owners are singled out.
The defendants in support of this SRO legislation admit that the provisions are burdensome but argue that the hardship exemption eliminates the difficulties. The hardship exemption provides for a total or partial reduction in the amount of the cash buyout or the number of dwelling units to be replaced if the Commissioner determines that there is no reasonable rate of return unless the property is altered or converted to another use.
A reasonable rate of return is defined as 8.5% of the property’s assessed value as an SRO building. This definition fails to take into account an owner’s initial investment in the property. So, by using this method of computation an owner receiving an 8.5% return on property valued as an SRO would not necessarily receive a fair return on his investment. Furthermore, plaintiff Seawall argues that since real property located in New York City is assessed at 45% of market value, *107 the actual return offered to Seawall and other SRO owners is not 8.5% of market value, but 8.5% of 45% of market value. The defendants fail to dispute this calculation and continue to evaluate the property as if it had no development potential. The cases[25] cited by the City of New York that found that 4% or 6% were reasonable returns do not hold that the rate of return is to be assessed against the property’s current value as opposed to examining an owner’s initial investment in the property.
In Northern Westchester Professional Park Assocs. v Town of Bedford (60 NY2d 492 [1983]) the Court of Appeals found that in determining whether a certain zoning regulation permitted a reasonable rate of return, a petitioner must show proof in dollars and cents of the owner’s investment in the property as well as the return that the property would produce from the various uses permissible under the existing classification. The court also stated that taxes, expenses and other carrying charges would be considered as well as the cost of many improvements made to the property.
Here, in order to show hardship, an owner would have to demonstrate an inadequate return on an investment based upon the value of the property as if it had no development potential. This total disregard of reasonable "investment backed” expectations on the part of SRO owners violates due process because it is inherently confiscatory. In French Investing Co. v City of New York (39 NY2d 587, 597, supra) the Court of Appeals "recognized that the Value’ of property is not a concrete or tangible attribute but an abstraction derived from the economic uses to which the property may be put.” In French, the court held that the zoning amendment was unreasonable and unconstitutional because "without due process of law, it deprives the owner of all his property rights, except bare title and a dubious future reversion of full use” (supra, at 597).
The defendants and intervenors argue that the City Council enacted this regulatory scheme in furtherance of the public interest. In support of this argument the defendants compare Local Law No. 9 with a landmarks preservation law. This analogy is without merit. A landmark is defined as a structure or site which has certain historic, architectural, aesthetic or cultural significance. Landmark preservation laws attempt to *108 protect these unique structures from land-use decisions which might fundamentally destroy or alter their character. Here, SRO buildings have no unique[26] importance. In fact, Local Law No. 9 does not even require that replacement buildings be SRO buildings; the units may be removed from the market so long as they are replaced with some form of low-cost housing. Clearly, any owner of residential property could be enlisted in the effort to provide housing for low-income people and any residential building could be used for that purpose. Moreover, landmark preservation laws normally prevent alteration or demolition of existing structures unless the owner can demonstrate hardship (Penn Cent. Transp. Co. v City of New York, 42 NY2d 324, affd 438 US 104), but if they place an undue and uncompensated burden on the individual owner, they may be held unconstitutional (Lutheran Church v City of New York, 35 NY2d 121, 129, supra) because such laws force "the owner to assume the cost of providing a benefit to the public without recoupment” (French Investing Co. v City of New York, 39 NY2d 587, 596, supra; see also, Dunham, A Legal and Economic Basis for City Planning, 58 Colum L Rev 650, 665, cited in FGL & L Prop. Corp. v City of Rye, 66 NY2d 111, 120 [1985]). Here, Local Law No. 9 continues the moratorium on altering or converting SRO units; it continues to prohibit withdrawal of SRO’s from the rental market and continues to place an affirmative obligation on SRO owners to renovate their buildings.[27] These aspects of Local Law No. 9 are identical to its predecessor Local Law No. 22 which I found violated plaintiffs’ due process rights.
The issue then is whether the exemptions contained in Local Law No. 9 remedy the due process constitutional difficulties of the SRO legislation. Upon examination of the exemptions contained in Local Law No. 9, I find that they fail to alleviate the constitutional infirmities which existed in prior SRO legislation and create additional ones. The exemptions are tantamount to extortion. While purportedly allowing the SRO owners to one day recover the use of their buildings, the law extracts a very high price for exercise of property rights. The regulatory scheme contained in Local Law No. 9 places an unfair and uncompensated burden on one class of property owners. The legislation in effect forces private indi *109 viduals to subsidize a low-income housing program administered by the City of New York. Such a regulatory scheme severely interferes with plaintiffs’ property rights. Accordingly, I find Local Law No. 9 was enacted in violation of plaintiffs’ due process rights.[28]
TAKINGS[29] ANALYSIS
Having found Local Law No. 9 violates plaintiffs’ due process rights the next issue is whether Local Law No. 9’s regulatory scheme constitutes an unconstitutional taking for which just compensation must be made. In contrast to a due process analysis, under the takings doctrine, "the government’s justifications are essentially irrelevant: compensation must be paid when property is 'taken’ regardless of whether the regulation yields net social benefits.”[30] However, analysis of the claim of an unconstitutional taking for which just compensation must be made requires a court to address two underlying questions. A court must first ascertain the existence and nature of the underlying property interest and then determine whether the government’s action with respect to that property interest has comported with constitutional requirements.[31]
Although the United States Supreme Court, in discussing the Takings Clause has engaged in ad hoc factual inquiries, the court has identified certain broad factors which are relevant in determining whether there has been a taking for Fifth Amendment purposes: (1) the character of the governmental actions, specifically whether the interference with the property constitutes a "physical invasion * * * [or whether it results] from some public program adjusting the benefits and *110 burdens of economic life to promote the common good”[32] and (2) " 'the economic impact * * * on the claimant * * * particularly the extent to which the regulation has interfered with investment backed expectations.’ ”[33]
The United States Supreme Court had few opportunities[34] to consider the taking issue in the first half of the 19th century.[35] The court began its expansion of the Takings Clause in the latter part of the 19th century enlarging the Bill of Rights to cover actions by the States. These decisions invariably upheld the local exercise of police power "despite the adverse impact on economic investment”.[36] However, in Pennsylvania Coal Co. v Mahon (260 US 393 [1922]) the Supreme Court began to change the trend of upholding State actions as a valid exercise of police power. Pennsylvania Coal stands for the proposition that a State statute that substantially furthers important public policies may so frustrate investment backed expectations as to amount to a taking.
Many cases before[37] and after Pennsylvania Coal (supra) *111 have recognized that the nature of the State action is critical in takings analysis. The three most recent land-use decisions which involve the issue of when a regulation becomes a taking are: (1) Keystone Bituminous Coal v DeBenedictis (480 US 470); (2) First English Evangelical Lutheran Church v Los Angeles County (482 US —, 96 L Ed 2d 250, 107 S Ct 2378); and (3) Nollan v California Coastal Commn. (483 US —, 97 L Ed 2d 677, 107 S Ct 3141.)
In Keystone Bituminous Coal (supra) an association of coal mine owners sued the Pennsylvania Department of Environmental Resources (DER) in a civil rights action seeking an injunction against enforcement of the Bituminous Mine Subsidence and Land Conservation Act (the Subsidence Act). The owners argued that section 4 of the act, which required that 50% of the coal beneath protected structures, such as public buildings and cemeteries, be kept in place to provide surface support, constituted a taking of their private property without compensation in violation of the Fifth and Fourteenth Amendments. The owners asserted that the resolution of their takings claim was governed by the principles enunciated by Justice Oliver Wendell Holmes in Pennsylvania Coal Co. v Mahon (260 US 393 [1922], supra). In that case, the petitioner asserted that Pennsylvania’s Kohler Act of 1921 which prohibited mining that caused subsidence under certain structures entitled them to an injunction. In its argument before the Supreme Court, the petitioner coal company contended that the Kohler Act was not a valid exercise of the police power but in reality was nothing more than " 'robbery under the forms of law’ ” because its purpose was "not to protect the lives or safety of the public generally but merely to augment the property rights of a favored few.” (Pennsylvania Coal Co. v Mahon, supra, at 397-398.) The Supreme Court, in a decision written by Justice Holmes, agreed with petitioner’s claim and stated: "As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of diminution. When it reaches a certain magnitude, in most if not in all *112 cases there must be an exercise of eminent domain and compensation to sustain the act.”[38]
In the Kohler Act, under challenge in the Pennsylvania Coal case (supra), the State of Pennsylvania prohibited mining that caused subsidence and barred the coal company from asserting any rights against surface owners who had released their right to support. This statute was said to constitute special legislation for the sole benefit of the surface owners and the act could only be sustained as constitutional if just compensation had been paid to the owners. In Keystone Bituminous Coal v DeBenedictis (supra) the court found that the, Subsidence Act differed from the Kohler Act in critical ways. In Pennsylvania Coal, the court believed that the State had acted only to ensure against damage to some private landowners’ homes whereas in Keystone, the State was acting to protect the public interest in the health, environment and the fiscal integrity of the area. The court went on to observe that many cases prior to and subsequent to Pennsylvania Coal have recognized that the nature of the State action is critical in a takings analysis.
However, in First English Evangelical Lutheran Church (supra) the Supreme Court held that payment of just compensation under the Fifth and Fourteenth Amendments was required even where only a temporary taking under the guise of a land-use regulation had occurred. In that case, the church operated a campground, known as "Lutherglen”, which had been flooded and its buildings destroyed following a forest fire which had occurred upstream from the church site. In response to the flooding, the County of Los Angeles adopted an interim ordinance prohibiting any construction within the flood area. The church commenced an action to recover damages alleging that the county had denied it all use of its property. The church also based its claim to recover damages from the township in inverse condemnation[39] and in tort for engaging in cloud seeding during the storm that flooded the *113 church’s property. The California lower court dismissed the complaint. The appellate court sustained the second caused of action in inverse condemnation. The United States Supreme Court, in reversing the holding that a temporary taking is not compensable, quoted the words of the Fifth Amendment that " 'private property [shall not] be taken for public use, without just compensation.’ ” (Supra, 482 US, at —, 96 L Ed 2d, at 263, 107 S Ct, at 2385.) The court held that a landowner who claims that his property had been taken by a land-use regulation may recover damages from the time the ordinance becomes effective until it is finally determined that the regulation constitutes a taking of the property. Moreover, the court held that "where the government’s activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.” (Supra, 482 US, at —, 96 L Ed 2d, at 268, 107 S Ct, at 2389.) The court recognized that its holding would limit the freedom of land-use planners and governing bodies of municipalities when enacting land-use measures. However, the court also recognized that in seeking to promote "societal purposes” and improve the public condition the government may take private property; however, upon exercise of that power the sovereign has the " 'constitutional obligation to pay just compensation.’ ” (Supra, 482 US, at —, 96 L Ed 2d, at 264, 107 S Ct, at 2386.) Thus, the First Evangelical Church decision holds that a property owner is entitled to compensation where land-use regulations exceed mere regulation by denying the owner all use of his property regardless of whether the taking is permanent or temporary.[40]
In the third case, Nollan v California Coastal Commn. (supra) the court held that where, as a condition of granting a new building permit, the owners of beachfront property were required to grant an easement to permit the public to pass along the beachfront part of their lot, the condition constituted a taking for which just compensation was required to be paid under the Fifth and Fourteenth Amendments.
Petitioners Nollan were owners of a beachfront lot in Ventura County, California, near public parks along the ocean. They applied to the California Coastal Commission to build a *114 three-bedroom house on their lot. The Commission granted the permit on the condition that the Nollans permit an easement allowing the public to pass across a portion of their property. The Nollans appealed to the California Superior Court claiming the imposition of the access condition violated the Takings Clause of the Fifth Amendment. The Superior Court granted the permit; however, the California Court of Appeal reversed, holding that although the access condition imposed on the Nollans diminished the value of their lot it did not deprive them of all reasonable use of their property.
The United States Supreme Court reversed the California Court of Appeal stating: "We think a 'permanent physical occupation’ has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may be continually traversed, even though no particular individual is permitted to station himself permanently upon the premises.” (Supra, 483 US, at —, 97 L Ed 2d, at 686, 107 S Ct, at 3145.)
The court, in analyzing the grounds for the access requirement, stated the Commission constitutionally may have had the right to ban construction of the house altogether if necessary to prevent congestion on the beaches or to aiford the public a view. It observed however that the necessary nexus between the condition imposed and the original purpose of the building restriction did not exist noting "In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.’ ” (Supra, 483 US, at —, 97 L Ed, at 689, 107 S Ct, at 3148.) Moreover, in response to the Commission’s rationale that the public interest would be served by a strip of publicly accessible beach along the coast, the court observed, "Th.e Commission may well be right that it is a good idea, but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its 'comprehensive program,’ if it wishes, by using its power of eminent domain for this 'public purpose,’ see US Const, Arndt V; but if it wants an easement across the Nollans, it must pay for it.” (Nollan v California Coastal Commn., supra, 483 US, at —, 97 L Ed, at 692, 107 S Ct, at 3150.)
Therefore, the recent United States Supreme Court decisions make it clear that even when an excessive police power regulation is only temporary, just compensation must never *115 theless be paid from the date of the taking to the date the government or court rescinds the regulation. Here, the defendants and intervenors argue that since the legislation is limited to a five-year period (with possible extensions) the law cannot constitute a taking. But, these recent decisions make that argument unpersuasive.
Equally without merit is defendants’ contention that Local Law No. 9 does not effect a taking because the plaintiffs can still make some use of their property although at a significant financial loss in most cases. In Nollan (supra), the condition imposed upon the petitioners, while diminishing the value of their lot, did not deprive them of all reasonable use of their property. The Supreme Court still found an unconstitutional interference with the Nollans’ property rights warranting payment of just compensation.
The Nollan decision (supra) seems to indicate that most regulations will now be subjected to a higher level of scrutiny than that previously utilized in determining claims of regulatory takings.[41] Since Pennsylvania Coal (260 US 393, supra), the court’s analysis concerning whether or not a regulation constitutes a taking has focused on the extent to which the regulation diminishes the value of property rights.[42] But, "[t]he Nollan Court shifted the focus of that analysis from diminution of value to the relationship between the regulation and its goal. As a result, land-use regulations must now overcome a two-part takings test. First, the regulation may not deny the owner ' "economically viable use of his land.” ’ Second, even if the regulation does not, the Court may rule that the lack of a sufficient 'nexus’ between the ends and means makes the regulation a taking.”[43] Under this new standard of heightened scrutiny, Local Law No. 9 constitutes a taking without just compensation.
CONCLUSION
Local Law No. 9 like its predecessor Local Law No. 22 continues to remove all development rights by interfering with reasonable investment backed expectations. Local Law *116 No. 9 continues to impose affirmative obligations upon owners to rehabilitate their buildings and to rent them to bona fide tenants. The exemptions are vague and only add to the unfairness of this regulatory scheme by extracting a price for the ability of a property owner to develop his property. Moreover, the property owner is still not assured that after all the units have been purchased back and replacement units found that permission to demolish the building will be granted.
As I stated in Seawall I (134 Misc 3d 187, supra) a severe low-income housing shortage exists in New York City caused by a combination of political, economic and social factors. The solution to this problem does not lie in shifting a governmental obligation to the private sector. The regulations impose an unreasonable and arbitrary scheme and frustrate plaintiffs’ property rights without due process of law.
Most of the plaintiffs purchased their buildings prior to the recent spate of SRO legislation. They could not have reasonably foreseen that the venture they initially chose to undertake would be this difficult and costly to extricate themselves from. Local Law No. 9 appears to be designed for the purpose of obtaining substantial amounts of money from SRO property owners to fund a new housing program. The City of New York has various options available to it' concerning the housing shortage. The city could, for example, remove the moratorium and permit development of the properties to their best use while using the revenue from the increased tax base to fund a public housing program or the city could offer an "upfront” payment to owners who house homeless people and condition this payment upon an owner’s improvement of the building.[44]
However, the city cannot constitutionally force a single segment of property owners to bear a public burden without just compensation. The current SRO legislation may be innovative, it may be well intentioned; however, it is not constitutional. As Justice Oliver Wendell Holmes once observed, "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.” (Pennsylvania Coal Co. v Mahon, 260 US 393, 416, supra.)
A violation of constitutional due process and the Takings Clause without payment of just compensation constitutes ir *117 reparable injury. The plaintiffs have complied with the requirements for preliminary injunctive relief by showing irreparable injury, a likelihood of success on the merits, and an inadequate remedy at law and a balancing of the equities in their favor (Albini v Solork Assocs., 37 AD2d 835). Further, the plaintiffs have demonstrated their entitlement to a permanent injunction.
Accordingly, plaintiffs are granted summary judgment on the claims seeking declaratory and injunctive relief as follows: I declare that the buy-out, replacement and hardship provisions of Local Law No. 9 violate plaintiffs’ due process rights and constitute a taking of their property for public use without just compensation in violation of the Fifth and Fourteenth Amendments of the US Constitution. Those provisions of Local Law No. 9 imposing affirmative obligations on plaintiffs to rehabilitate all vacant SRO units and compelling owners to rent them to bona fide tenants similarly violate plaintiffs’ due process rights. These provisions are declared invalid and the defendants are enjoined from enforcing them. Plaintiffs are granted leave to amend their complaints to include a cause of action for damages.
[Portions of opinion omitted for purposes of publication.]

. An SRO is defined as a living unit which shares a kitchen and/or bathroom with one or more other units. (Blackburn, Single Room Occupancy in New York City, 1986 Report — prepared for the City of New York Department of Housing, Preservation and Development.)

. Challenges of this sort have occurred before (see, for example, Local Laws, 1985, No. 59 of City of New York, Declaration of legislative findings and intent ["The council hereby finds and declares that a serious public emergency exists in the housing of a considerable number of persons which emergency has been created by the loss of single room occupancy units housing lower income persons: that the loss of such housing units has caused serious hardship for occupants who have been forced to relocate * * * that a considerable number of such persons have become part of a growing homeless population; that the intervention of the city government is necessary to protect such housing stock by imposing a moratorium on conversions, alterations and demolitions of single room occupancy multiple dwellings”]).

. Administrative Code of City of New York § 27-198.2.

. Administrative Code of City of New York § C26-118.10.

. Administrative Code of City of New York § C26-118.10, as added by Local Law No. 59 of 1985.

. This obligation is commonly referred to as the "antiwarehousing” provision. (See, Administrative Code of City of New York § D26-58.02.)

. See, n 6.

. Administrative Code of City of New York § C26-118.10 (b) (1) (4).

. Administrative Code of City of New York § 27-198.2.

. See, n 3.

. Local Laws, 1987, No. 1, § 5.

. Administrative Code of City of New York § 27-2151 (a) (1), (2).

. Administrative Code of City of New York § 27-198.2 (d).

. Administrative Code of City of New York § 27-198.2 (d) (4) (a) (i).

. Administrative Code of City of New York § 27-198.2 (d) (4) (a) (ii).

. Administrative Code of City of New York § 27-198.2 (d) (4) (a) (ii).

. Administrative Code of City of New York § 27-198.2 (d) (4) (b) (i).

. Administrative Code of City of New York § 27-198.2 (d) (4) (b).

. Chicago, Burlington & Quincy R. R. Co. v Chicago, 166 US 226, 236 (1897).

. This might not be the property owner’s only payment. It is common knowledge that under these circumstances an owner would have to offer an inducement or cash buyout to the tenant in occupancy in order to persuade him/her to move.

. 58 NY Jur, Taxation, § 1 (rev ed).

. Felner v Office of Rent Control, 27 NY2d 692 (1970); Bucho Holding Co. v Temporary State Hous. Rent Commn., 11 NY2d 469 (1962).

. Penn Cent. Transp. Co. v New York City, 438 US 104 (1978).

. Administrative Code of City of New York § 27-198.2.

. The claims of due process violations are contained in Seawall Associates’ first cause of action particularly paragraph 18; Testamentum’s first cause of action — paragraph 13; ANBE Realty’s paragraphs 16, 26, 27, 28.

. There is some disparity in the literature between the correct nomenclature of the term "taking” and/or "takings” doctrine or analysis. (See, for example, Keystone Bituminous Coal v DeBenedictis, 480 US 470 [1987] ["takings”]; see, Marcus, Mandatory Development Rights Transfer and the Taking Clause: The case of Manhattan’s Tudor City Parks, 24 Buffalo L Rev 77 [1974].) There is no difference in meaning between the two usages. In this opinion, the term "takings” will be employed.

. Note, The Constitutionality of Rent Control Restrictions on Property Owners’ Dominion Interests, 100 Harv L Rev 1067, 1079 (1987).

. Note, Justice Rehnquist’s Theory of Property, 93 Yale LJ 541, 543 (1984).

. Penn Cent. Transp. Co. v New York City, 438 US 104, 124; see also, Loretto v Teleprompter Manhattan CATV Corp., 458 US 419.

. Judson, Defining Property Rights: The Constitutionality of Protecting Tenants from Condominium Conversion, 18 Harv Civ Rights — Civ Liberties L Rev 179, 204 (1983); see also, Annotation, Supreme Court’s Views As To What Constitutes "Taking, ” Within Meaning of Fifth Amendment’s Command That Private Property Not Be Taken For Public Use Without Just Compensation, 57 L Ed 2d 1254.

. However, the New York courts in Brick Presbyt. Church v Mayor of City of N. Y. (5 Cow 538 [1826]) examined the Takings Clause in depth. The Presbyterian church had been granted title to lands on the outskirts of the city for a church and cemetery. As the city grew, the cemetery became a health hazard and an ordinance was passed forbidding use of the property for burials. The ordinance left the church with almost no other use for its property and deprived the parish of a place to bury its dead. Yet, the court found in the city’s favor, primarily upon the ground that the ordinance was promulgated in furtherance of the health and general welfare of the citizens of New York and that, therefore, the church’s property rights had to yield to the public welfare. (As cited in Marcus, Mandatory Development Rights Transfer and the Taking Clause: The case of Manhattan’s Tudor City Parks, 24 Buffalo L Rev 77, 96.)

. Prior to the 19th century, the principle that "the state necessarily owes compensation when it takes private property was not generally accepted in either colonial or revolutionary America. Uncompensated takings were frequent and found justification first in appeals to the crown and later in republicanism”. (Note, The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment, 94 Yale LJ 694 [1985].)

. Marcus, Mandatory Development Rights Transfer and the Taking Clause: The case of Manhattan’s Tudor City Parks, 24 Buffalo L Rev 77, 98.

. See, for example, United States v Causby, 328 US 256; Penn Cent. *111 Transp. Co. v City of New York, 438 US 104; City of Eastlake v Forest City Enters., 426 US 668; Welch v Swasey, 214 US 91 (1909); Village of Euclid v Ambler Realty Co., 272 US 365; Kaiser Aetna v United States, 444 US 164 (1979).

. Pennsylvania Coal Co. v Mahon, 260 US 393, 413.

. "The traditional condemnation proceeding is a judicial action by a public agency, or a private entity to which the power has been delegated to take private property for public use and to determine compensation for the taking * * * [Whereas, i]n inverse condemnation, both the position of the parties and the sequence of the determination of value are inverted — the erstwhile owner brings action against a public agency, alleging that it has taken his property and demanding compensation.” (Magavern, The Evolution and Extension of The New York Law of Inverse Condemnation, 24 Buffalo L Rev 273, 274 [1974].)

. The significance of this decision is that it is the first time the court determined that money was "a potential landowner remedy when government regulations severely restrict private land use.” (Callies, Takings Clause — Take Three, 73 ABA J 48, 53 [Nov. 1987].)

. Note, The Supreme Court 1986 Term — Leading Cases, 101 Harv L Rev 119, 247 (Nov. 1987); see also, Michelman, Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation” Law, 80 Harv L Rev 1165, 1190-1194 (1967).

. See, n 41.

. 101 Harv L Rev 119, 247-248.

. Oser, Locking in the Stock of SRO’s, New York Sunday Times, Mar. 1, 1987, at 6.

. Omitted from publication.

. Omitted from publication.

. Omitted from publication.