SEAWALL ASSOCIATES et al., Respondents, and 459 WEST 43RD STREET CORP. et al., Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents, and RICHARD WILKERSON et al., Intervenors-Appellants. (Action No. 1.)

EASTERN PORK PRODUCTS COMPANY et al., Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents. (Action No. 2.)

TESTAMENTUM, Respondent, v CITY OF NEW YORK et al., Defendants-Appellants. (Action No. 3.)

First Department, December 1, 1988

## APPEARANCES OF COUNSEL

*Nathan Dershowitz* of counsel *(Sheldon D. Camhy* and *George G. Nelson* with him on the brief; *Dershowitz & Eiger, P. C.,* and *Shea & Gould,* attorneys), for Seawall Associates, respondent.

*Marvin L. Schwartz* of counsel *(Shapiro & Schwartz,* attorneys), for Anbe Realty Co., respondent.

*Philip H. Schaeffer* of counsel *(Jane D. Connolly* and *Steven Mairella* with him on the brief; *White & Case,* attorneys), for 459 West 43rd Street Corp. and another, respondents-appellants in actions Nos. 1 and 2.

*Gary M. Rosenberg* of counsel *(Franklin R. Kaiman* and *Theresa J. Hecker* with him on the brief; *Rosenberg & Estis, P. C.,* attorneys), for Sutton East Associates-86 and another, respondents-appellants.

*Elizabeth Dvorkin (Leonard Koerner* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for City of New York, appellants-respondents in actions Nos. 1 and 2 and defendants-appellants in action No. 3.

*Saralee E. Evans* of counsel *(Norman Siegel, Wayne G. Hawley* and *Anne R. Teicher* with her on the brief), for Richard Wilkerson and others, intervenors-appellants.

*Virginia Shubert* of counsel *(Robert M. Hayes* and *Mitchell S. Bernard* with her on the brief), for Coalition for the Homeless, intervenor-appellant.

*Edmund J. Burns* of counsel *(Maria Scorcia* with him on the brief; *Burns, Kennedy, Schilling & O'Shea,* attorneys), for Testamentum, respondent.

*Carol S. Keenan* of counsel *(Ruben Klein, P. C.,* and *Ronald A. Zumbrun, Edward J. Connor, Jr.,* and *Timothy A. Bittle,* attorneys), for Pacific Legal Foundation, *amicus curiae.*

## OPINION OF THE COURT

Ross, J. P.

The issue in these consolidated actions is whether Local Laws, 1987, No. 9 of the City of New York, which was approved March 5, 1987 and which, *inter alia,* provides for a

five-year moratorium on the demolition or conversion of single-room occupancy housing, is constitutional.

For more than 10 years, the governmental officials of the City of New York have been wrestling with the problems related to single-room occupancy (SRO) housing.

An SRO has been defined as a living unit which shares a kitchen and/or bathroom with one or more other units (see, Blackburn, Single Room Occupancy in New York City [1986 report prepared for the City of New York Department of Housing, Preservation and Development]). SRO units are found in hotels, apartment buildings, and even private homes. We "judicially notice" (Prink v Rockefeller Center, 48 NY2d 309, 316-317 [1979]), as a matter of common knowledge, that for generations, SRO units have served as a relatively inexpensive form of shelter for persons of low and moderate income.

Over the past decade, two major factors have caused a significant decline in the number of SRO units available to the poor. First, upon the basis of adopting the widespread opinion that SRO units were "substandard" housing, the city adopted a policy of encouraging the demolition, and then redevelopment of the buildings containing such units. Second, due to the rapid rise in real estate values in New York City, particularly in Manhattan, where 75% of the SRO units are located, many SRO owners found it more profitable to convert their buildings to commercial and other residential uses, rather than to continue to operate them as SROs.

Mr. Paul A. Crotty, Commissioner of the New York City Department of Housing Preservation and Development (HPD), in an affidavit, dated April 13, 1987, which was submitted in support of the city's position in the instant litigation, stated, in pertinent part: "Significant hardships and social costs have attended the decline in the number of SRO units. SRO residents have frequently been pressured to vacate units through the use of threats, violence, reductions in essential services and other forms of harassment. The elderly, physically and mentally disabled and non-English speaking residents of SROs have been especially vulnerable to such tactics. Because of a severe shortage of lower cost housing in New York City, displaced SRO residents often find it difficult or impossible to find new housing. * * * Moreover, there is substantial evidence that the displacement of SRO residents and the loss of these units has contributed to the City's growing homeless

population. Providing shelter for the homeless has placed a significant strain on the City's resources. The City provides shelter for a far greater number of homeless people than any other City in the county. Indeed, New York City currently houses as many homeless individuals in its shelters as it did at the height of the Great Depression".

As soon as the city government realized that SRO units were disappearing at an alarming rate from the city's housing stock, with the result that the number of affordable rental housing units for the poor was shrinking, the city abandoned its policy, mentioned *supra,* of encouraging the destruction and redevelopment of SRO units, and took steps to stop the decline in this form of housing.

In 1982, the city signalled its change in policy, by amending Administrative Code of the City of New York (Administrative Code) J51-2.5 (i) (6) (now § 11-243 [i] [6]), so as to eliminate the J51 property tax abatements for the conversion of SRO dwellings to other uses; and, the Court of Appeals in *Matter of Replan Dev. v Department of Hous. Preservation & Dev.* (70 NY2d 451 [1987], *appeal dismissed* — US —, 108 S Ct 1207 [1988]), held that legislation constitutional.

Subsequently, in an effort to discourage the harassment of SRO residents by owners, who were seeking to empty their buildings in order to make more profitable use of them, the City Council, in 1982, enacted the Unlawful Eviction Law *(see,* Local Laws, 1982, No. 56, of City of New York), and, funded the Special Housing Unit in the New York County District Attorney's Office, which specialized in the investigation and prosecution of corrupt landlords, who used unlawful means to drive SRO tenants out.

Thereafter, in 1983, for the purpose of slowing up efforts at alteration or demolition of SRO properties, the Council enacted Local Laws, 1983, No. 19, of the City of New York, which provided that the City Department of Buildings could not issue a permit for the alteration or demolition of an SRO building, unless the Commissioner of HPD certified that there had been no harassment of the residents of such a building during the previous 36 months. Furthermore, this law states, if HPD certification is denied, then the Department of Buildings is prohibited *(see,* Administrative Code § 27-198) from issuing this type of permit for a period of 36 months from the date of the denial of the certification. This regulatory scheme was sustained, after a Federal constitutional challenge, in *Sadowsky v City of New York* (732 F2d 312 [2d Cir 1984]).

When the enactment of the laws, discussed *supra*, did not stem the decline in the number of SRO units, the Council enacted Local Laws, 1985, No. 59, of the City of New York. In enacting this law the Council declared that it had found "a serious public emergency exists * * * created by the loss of single room occupancy units housing lower income persons" *(see,* Local Law No. 59 § 1). The purpose of this law was to maintain the status quo, while the city reformulated its policy of dealing with the SRO problem. Our examination of Local Law No. 59 indicates that it, in substance, placed an 18-month moratorium, retroactive to January 9, 1985, on the demolition or conversion of most categories of SRO properties, and mandated a study of SRO housing.

Mr. Anthony J. Blackburn, as project director, conducted the mandated study. In 1986, he issued to the HPD a report, which was prepared by Urban System Research & Engineering, Inc., and entitled: SINGLE ROOM OCCUPANCY IN NEW YORK CITY.

Review of the Blackburn study by us indicates it found that the number of SROs was diminishing, SROs house a predominantly poor population, and for SRO tenants, there are no housing alternatives. Furthermore, in substance, the study recommended a major effort by the city to preserve SROs, owners of SROs should be allowed to demolish them, as long as they replace the units in some other location, and the needs of SRO tenants would be better served if the landlords of SROs were not-for-profit corporations.

Before city officials had finished evaluating the Blackburn study, and formulating a new SRO housing plan, the moratorium, established by Local Law No. 59, expired on July 9, 1986. Therefore, the Council enacted Local Laws, 1986, No. 22 of the City of New York, which extended the moratorium on demolition or conversion of SROs to December 31, 1986. Local Law No. 22 also banned "warehousing", by requiring SRO owners to maintain the units in habitable condition and, to make a good-faith effort to rent them. Additionally, if an SRO unit was not occupied by a bona fide tenant for a period of 30 days or longer, this law created a rebuttable presumption that the SRO landlord was in violation and, for each such unit, the landlord was subjected to a statutory penalty of $500, plus a daily fine of $250. Moreover, this law exempted largely vacant buildings from the moratorium and "antiwarehousing" provisions, either as of right, or by payment to a housing fund.

The constitutionality of Local Law No. 22 was challenged by Seawall Associates (Seawall), 459 West 43rd Street Corporation (459 West), Eastern Pork Products Company (Eastern), Sutton East Associates-86 (Sutton East), Channel Club and Anbe Realty Co. (Anbe Realty).

Seawall is a partnership, which is engaged in the business of acquiring and holding real property in midtown Manhattan for development and sale. In October 1984, Seawall purchased several contiguous lots, in the block bounded by 33rd and 34th Streets and Eighth and Ninth Avenues. Included in this plot were old structures in poor condition, which had been operated by prior owners as SRO residential hotels. One of these buildings was half empty, a second was nearly vacant, and a third contained no tenants at all. The intention of Seawall is to demolish all of the buildings, and erect a commercial office building.

459 West is in the business of acquiring real estate for, *inter alia,* development and sale. On or about April 4, 1970, an affiliate of 459 West acquired "The Diplomat", which was operated as a residential hotel, containing 216 SRO units. The Diplomat is located at 108 West 43rd Street, in New York County. By 1986, according to owner 459 West, 110 of the Diplomat's SRO units were vacant and uninhabitable. Unequivocally, 459 West states that it has no intention of offering any vacant SRO unit for occupancy, or to continue the tenancy of any tenants dwelling in the occupied SRO units, except as required by law.

Eastern is a partnership and, like 459 West, it is engaged in the business of acquiring real estate for the purposes of development and sale. Pursuant to a contract, made on or about May 1, 1986, Eastern purchased an SRO building located at 611 Ninth Avenue, New York County. This multiple dwelling contained 18 SRO units, of which 8 were occupied by tenants, 10 were vacant and uninhabitable. Unequivocally, Eastern, like 459 West, asserts that it has no intention of offering any vacant SRO unit for occupancy, or to continue the tenancy of any tenants dwelling in the occupied SRO units, except as required by law.

Sutton East, in January 1985, purchased the Gracie Square Hotel, located at 451 East 86th Street, in Manhattan. This hotel contained 31 SRO units, many of which had been vacant for some time. Approximately three months after it purchased that hotel, Sutton East purchased several parcels of property,

which were adjacent to the hotel, and located at 455 East 86th Street. Thereafter, Sutton East demolished the structures existing on the aforementioned parcels, and constructed a residential condominium building which is known as, and owned by, Channel Club. Sutton East complains that the SRO regulatory legislation has compelled it to maintain a dilapidated SRO hotel adjacent to the new luxury high-rise Channel Club, notwithstanding the fact that Sutton East allegedly has negotiated, without harassment, force, or interruption of services, with the tenants for the good-faith surrender of possession of the SRO units. Furthermore, Sutton East claims its purchase, for substantial consideration, of the hotel was part of an over-all plan to redevelop the hotel, consistent with the construction of the Channel Club.

Anbe Realty is a partnership. Since on or about 1969, Anbe Realty has been the registered owner and operator of a five-story building, which contains 29 SRO units, and which is located at 305 West 29th Street, in New York County. Subsequently, by the spring of 1985, before the enactment of Local Laws, 1986, No. 22, but during the Council's consideration of Local Laws, 1985, No. 59, which was the 18-month moratorium legislation, discussed *supra*, Anbe Realty had succeeded in emptying that building of its SRO tenants, as a result of two years of legitimate negotiations with the tenants, attrition, and lawful dispossess proceedings. As evidence of its good-faith efforts, Anbe offered a certificate of no harassment issued by the HPD, which is dated March 22, 1985. Following the receipt of this certificate, Anbe Realty, at substantial expense, engaged architects, engineers and other professionals to prepare and file building plans to convert the now empty building into a class A multiple dwelling with 11 self-contained units, and on July 19, 1985, the City Department of Buildings issued a building permit to Anbe Realty. Due to the enactment of Local Laws, 1985, No. 59, which, as mentioned *supra*, made the moratorium legislation retroactive to January 9, 1985, Anbe's conversion plans were halted, and its building permit was revoked.

Plaintiffs Seawall, Eastern, 459 West, Sutton East and Anbe Realty, in 1986, separately commenced actions, which were consolidated under index number 20891 of 1986, against the city. The complaints of these five plaintiffs, in substance, sought to permanently enjoin the city from enforcing Local Laws, 1986, No. 22 against them, upon the grounds that the law was unconstitutional, since it allegedly violated the "Tak-

ing" Clauses of the US and NY Constitutions, which prohibit the taking of property without due process and just compensation, the Council exceeded its constitutionally granted legislative authority by enacting a law, which conflicted with New York State law, and the law did not comply with the State Environmental Quality Review Act (SEQRA), the City Environmental Quality Review (CEQR), and the Environmental Conservation Law (ECL). Thereafter, by order, Supreme Court, New York County, filed February 20, 1987, the IAS court, in substance, declared invalid the antiwarehousing part of Local Law No. 22, which imposed the affirmative obligations on plaintiffs to rehabilitate all their vacant SRO units and to rent them to bona fide tenants, and enjoined the city from enforcing those provisions.

The city did not perfect an appeal from the February 20, 1987 order of the IAS court, since Local Laws, 1987, No. 1, which altered the provisions of Local Laws, 1986, No. 22 had already been enacted into law, and, as a result, in the city's opinion that appeal had become moot.

While Local Laws, 1986, No. 22 was in effect, the HPD finished its review of the Blackburn study, discussed *supra,* and the result was the first comprehensive city SRO legislation, which was Local Laws, 1987, No. 1, and that law was subsequently amended, and reenacted by the Council, on March 5, 1987, as Local Law No. 9.

This law establishes a five-year moratorium on conversion, alteration, and, demolition of SRO units *(see,* Administrative Code § 27-198.2), and requires SRO owners to maintain their units in a habitable condition and make a good-faith effort to rent them *(see,* Administrative Code §§ 27-2150—27-2152). If an SRO owner violates the provisions, mentioned *supra,* he or she is subject to civil penalties *(see,* Administrative Code § 27-198.2 [g]; § 27-2152 [e]).

Our examination of the law indicates its intent is to preserve and make available existing SRO housing. Therefore, the law exempts buildings, which do not actually offer such housing, and an example is a building that has been vacant for some time *(see,* Administrative Code § 27-198.2 [d] [1] [b]), and also exempted are buildings which are not subject to the market forces that encourage the demolition and conversion of SROs, such as government-owned buildings, and buildings which are part of an approved project for the rehabilitation and preservation of SRO dwellings *(see,* Administrative Code § 27-198.2 [b] [1] [d], [g]).

Furthermore, the law allows SRO owners the option of withdrawing protected SRO units from the housing market, upon providing for the replacement of those units (see, Administrative Code § 27-198.2 [d] [4] [a]). A unit may be exempted from the law following payment to an SRO Housing Development Fund Company (Fund) of an amount equal to the cost, which has been currently set at $45,000, of creating a replacement unit. The funds contributed are to be used to preserve, acquire, and develop housing affordable by low- and moderate-income persons. Alternatively, actual replacement units may be provided by acquiring an existing multiple dwelling, constructing a new multiple dwelling, or rehabilitating an existing dwelling unit. Replacement units are to be sold or leased to a not-for-profit organization for operation. Since Fund contributions may not result in immediately available alternative units, where 50% or more of the SRO units in a building are occupied, an owner may obtain an exemption for the occupied units only by obtaining or developing actual replacement units (see, Administrative Code § 27-198.2 [d] [4] [a]), and, where an SRO building is less than 50% occupied, an owner desiring to take advantage of the replacement or buy-out options will be responsible for relocating the remaining tenants in comparable housing, at comparable rent, in the same borough of the city (see, Administrative Code § 27-198.3 [a]).

Finally, the law permits an SRO owner to seek an exemption from the Commissioner of HPD, upon hardship grounds (see, § 27-198.2 [d] [4] [b]), if he or she can show no possibility of earning a reasonable rate of return, which has been defined as 8½% of the building's assessed value, if he or she is compelled to maintain the property as an SRO, and that utilization of the replacement exemption would substantially impair the feasibility of redeveloping the property for any other use. When such hardship is demonstrated, HPD may reduce in whole or part the amount to be contributed to the Fund or the number of replacement units to be provided by an owner, in order to withdraw SRO units from the housing market. However, the law does not allow an owner to make use of this exemption, where his or her inability to earn a reasonable return is the consequence of intentional acts of mismanagement, which are designed to destroy the property's value as an SRO dwelling (see, Administrative Code § 27-198.2 [d] [4] [b]).

After Local Law No. 9 took effect, the plaintiffs, in action No. 1, index number 20891/1986, Seawall, 459 West, Eastern,

Sutton East, Channel Club and Anbe Realty amended their complaints, mentioned *supra,* and contended, in substance, Local Law No. 9 does not comply with the environmental laws, such as SEQRA, CEQR and ECL, it is an unlawful tax, is arbitrary and confiscatory, and in violation of the Due Process and Taking Clauses of the US and NY Constitutions.

In addition to action No. 1, plaintiffs Eastern, 459 West, Durst Partners, Jambod Enterprises, Inc. (Jambod), Mygatt/Perry, Felix Ziade and Rocco Imperial commenced action No. 2, index number 04016 of 1987, against the city, and contended, in their complaint, that Local Law No. 9 is invalid, since it allegedly violates SEQRA, CEQR and ECL, which is legislation intended to protect the environment. Plaintiffs Eastern and 459 West in this action No. 2 are also plaintiffs in action No. 1. The other plaintiffs in action No. 2 are the Durst Partners, who own an SRO building, at 147-51 West 43rd Street, New York County, and that property contains 30 SRO units, of which allegedly only one is occupied, and the remainder are vacant and uninhabitable; Jambod operates a nightclub, known as "Shout", at 124 West 43rd Street, New York County; Mygatt/Perry, an architectural firm at 102 West 43rd Street, New York County; and Messrs. Ziade and Imperial, who for more than 15 years, have resided in The Diplomat.

Testamentum commenced action No. 3, index number 7247 of 1987 against the city, on the ground Local Law No. 9 is in violation of the Due Process and Taking Clauses of the US and NY Constitutions. This plaintiff is a subsidiary of Covenant House, which is a not-for-profit corporation, with offices located in Florida, New York, Texas, Canada and Central America. In October 1984, Testamentum, also a not-for-profit corporation, purchased the Times Square Hotel at 43rd Street and Eighth Avenue, New York County, to upgrade it, and then apparently sell the property at a profit, for the purpose of obtaining funds to support the charitable work of Covenant House. There are 735 rooms in the hotel. At the time of acquisition, Testamentum states this building was operated mainly as a hotel for transients, but it also contained some units subject to rent stabilization. Moreover, in its complaint, Testamentum contends that the income it derives "from transient guests and other occupants is grossly insufficient to provide the hotel an adequate return for cost and upkeep."

The plaintiffs in the three actions moved for preliminary injunctive relief, upon the ground, in substance, that they would suffer irreparable harm if Local Law No. 9 was made

applicable to them while the actions were pending determination. In response, the defendant city opposed the motions for a preliminary injunction, and cross-moved for summary judgment in action No. 2.

Thereafter, the IAS court consolidated the motions in the three actions, converted the plaintiffs' motions for injunctive relief to motions for summary judgment, granted the defendant city's cross motion for summary judgment in action No. 2, which was the action that sought invalidation of Local Law No. 9, upon the basis it violated the environmental laws, and granted the plaintiffs summary judgment in actions Nos. 1 and 3, upon the ground that the antiwarehousing, buy-out, replacement, and hardship provisions of Local Law No. 9 violated plaintiffs' due process rights, and constitute a taking of their property for public use without just compensation, in violation of the Fifth and Fourteenth Amendments of the US Constitution. Furthermore, the IAS court held invalid those provisions of Local Law No. 9, which imposed affirmative obligations on plaintiffs to rehabilitate all of their vacant SRO units, and compelled them to rent them to bona fide tenants, on the grounds that the provisions violated plaintiffs' due process rights (138 Misc 2d 96).

We recognize that every law is presumed constitutional, and only when unconstitutionality is shown to exist beyond a reasonable doubt, is the presumption overcome *(Defiance Milk Prods. Co. v Due Mond,* 309 NY 537, 541 [1956]; *Montgomery v Daniels,* 38 NY2d 41, 54 [1975]). This presumption of constitutionality is not limited to State statutes, since it "applies * * * to ordinances of municipalities as well" *(Lighthouse Shores v Town of Islip,* 41 NY2d 7, 11 [1976]).

When the Court of Appeals, in *Replan Dev. v Department of Hous. Preservation & Dev.* (70 NY2d 451, *supra)* found constitutional the city legislation, which eliminated J51 tax abatement for the conversion of SRO housing to other uses, it stated in that case *(supra,* at 457), forestalling "the loss of SRO housing and to discourage the precipitous eviction of tenants—are valid public purposes". The United States Supreme Court recently indicated that a rent-control ordinance of the City of San Jose, California, was constitutional on its face, and "during a housing shortage, the social costs of the dislocation of low-income tenants can be severe" *(Pennell v City of San Jose,* 485 US —, —, 108 S Ct 849, 859, n 8 [1988]).

The plaintiffs in this litigation do not contest the city's

position (see, Local Laws, 1987, No. 1, § 1, which is the predecessor statute to Local Law No. 9) that, if the city had not acted to stop the extinction of SRO units, the ranks of the homeless would have increased, since the SRO owners, if left to their own devices, would have converted those units to more profitable uses. In fact, an affidavit, submitted in support of the city's position, stated that in 1987, before Local Law No. 9 became effective, there were only "approximately 52,000 SRO units * * * [left] throughout New York City".

Two amendments to the United States Constitution safeguard property rights from governmental interference. Those amendments are the Due Process Clauses of the Fifth and Fourteenth, and the "Taking" or Just Compensation Clause of the Fifth. The Federal constitutional requirement of due process of law has been made applicable to the States through the Fourteenth Amendment. Further, the United States Supreme Court in *Chicago, Burlington & Quincy R. R. Co. v Chicago* (166 US 226 [1897]) made the "Taking" or Just Compensation Clause of the Fifth Amendment applicable to the States.

New York's Constitution declares no person shall be deprived of his property without due process of law (see, NY Const, art I, § 6), and that private property may not be taken without just compensation (NY Const, art I, § 7 [a]).

It cannot be seriously contended by anyone that some provisions of Local Law No. 9, such as those that impose a five-year moratorium on the conversion, alteration, and demolition of SRO units, and which prohibits the warehousing of such units, will not cause SRO owners to lose economic benefits. However, on many occasions, the United States Supreme Court, as well as this State's Court of Appeals, have held Local Laws valid, which restricted owners from making the most profitable use of their property. For example, the United States Supreme Court, in *Penn Cent. Transp. Co. v New York City* (438 US 104 [1978]), upheld the constitutionality of New York City's Landmarks Preservation Law, which was enacted to protect historic landmarks and neighborhoods, and which requires the owners to keep them in good repair, and to seek government approval before making any exterior alteration; the Court of Appeals, in *Spring Realty Co. v New York City Loft Bd.* (69 NY2d 657 [1986], *appeal dismissed —* US —, 107 S Ct 3179 [1987]), held New York City validly exercised its police power, when it enacted the Loft Law, in order to deal with a housing crisis; and, the Court of Appeals,

in *Maldini v Ambro* (36 NY2d 481 [1975], *appeal dismissed and cert denied* 423 US 993 [1975]), upheld an amendment to a zoning ordinance of the Town of Huntington, whose purpose was to provide adequate housing for the elderly.

In *Matter of Golden v Planning Bd.* (30 NY2d 359, 377-378 [1972]), the Court of Appeals significantly states: "It is the nature of all land use and development regulations to circumscribe the course of growth within a particular town or district and to that extent such restrictions invariably impede the forces of natural growth *(Euclid* v. *Ambler Co.,* 272 U.S. 265 * * * *National Land & Inv. Co.* v. *Easttown Twp. Bd. of Adj.,* 419 Pa. 504, 532 * * *). Where those restrictions upon the beneficial use and enjoyment of land are necessary to promote the ultimate good of the community and are within the bounds of reason, they have been sustained".

The United States Supreme Court has ruled that for a statute not to constitute an unconstitutional taking, it must "substantially advance legitimate state interests", and not deny "an owner [an] economically viable use of his [or her property]" *(Agins v Tiburon,* 447 US 255, 260 [1980]). In other words, there must be a relationship between the purpose of the legislation and the methods employed. Therefore, once a genuinely valid purpose is established, a law can restrict the use of property, "unless the denial would interfere so drastically with the * * * use of * * * property as to constitute a taking" *(Nollan v California Coastal Commn.,* 483 US 825, —, 107 S Ct 3141, 3147 [1987]).

Although one owner or class of owners may bear a heavier economic burden than another, that fact alone does not automatically mean that a property owner is being singled out for an unconstitutional taking *(Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US 470, 491-492 [1987]). The United States Supreme Court states, in pertinent part, in *Keystone Bituminous Coal Assn. v DeBenedictis (supra,* at 491-492): "Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. * * * These restrictions are 'properly treated as part of the burden of common citizenship.' *Kimball Laundry Co.* v. *United States,* 338 U.S. 1, 5 (1949). Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' *Mugler* v. *Kansas,* 123 U.S., at 665". In *Penn Cent. Transp. Co. v New York City (supra),* the United States Supreme Court ruled the city may

forbid, in the public interest, the destruction or alteration of buildings.

■ After reviewing the record before us, we find that Local Law No. 9, following years of study and public hearings, was enacted by the Council to cope with a serious public emergency, since it is undisputed that, unless SRO owners were prohibited from converting, altering, demolishing, and warehousing their units, the city's homeless population would have risen, by the influx of former SRO tenants, who are frequently elderly and mentally or physically handicapped persons, with limited incomes.

While Local Law No. 9 may temporarily diminish the value of an SRO property for the period of the moratorium, it does not reduce the value of that property to the level where it would be an unconstitutional taking. The Court of Appeals in *de St. Aubin v Flacke* (68 NY2d 66, 77 [1986]) states that "a property owner does not prove a taking solely by evidence that the value has been reduced by the regulation, even if it has been substantially reduced. * * * To be successful [such owner] must establish that the regulation attacked so restricts his property that he is precluded from using it for any purpose for which it is reasonably adapted *(Levitt v Incorporated Vil. of Sands Point,* 6 NY2d 269, 273; *Arverne Bay Constr. Co. v Thatcher,* 278 NY 222, 226)". Measured by the standard of *de St. Aubin v Flacke (supra)* we find that Local Law No. 9 does not unconstitutionally deprive an SRO owner of economic benefit from his or her property, since it permits them to earn a return of 8½% of the assessed value of the property, and this figure of 8½% of the assessed value was derived from the hardship provisions under the rent control laws *(see,* Administrative Code § 26-408 [b] [5] [a]), and rent control laws have been held constitutional in this State *(Benson Realty Corp. v Beame,* 50 NY2d 994 [1980], *appeal dismissed* 449 US 1119 [1981]).

The city concedes, at page 32 of its main brief, that "the anti-warehousing component of the legislation is new to New York law."

Almost 40 years ago, the Court of Appeals held that a "local law cannot be held to operate as a 'taking' of * * * property without due process of law", if it is "designed to meet an immediate and pressing exigency", even if a property owner is required to remain in the housing business, when he or she would prefer to erect a commercial structure *(Loab Estates v*

*Druhe,* 300 NY 176, 180 [1949]). Incidentally, antiwarehousing legislation has been sustained against a "taking" challenge by a Federal District Court, located in a sister State *(Help Hoboken Hous. v City of Hoboken,* 650 F Supp 793, 798 [DNJ 1986]).

We disagree with the plaintiff's contention that the replacement and buy-out options of Local Law No. 9 are exorbitant, or that they are, in reality, a tax, which merely goes into the city coffers.

Our examination of the record indicates the city set the buy-out figure at $45,000 since that was the estimated cost of the acquisition and rehabilitation of an SRO unit, and the plaintiffs offer no persuasive evidence which indicates that said sum is arbitrary or capricious.

Based upon our examination of the record, we find that these moneys, when received, rather than being used for general government purposes, will go directly into a special fund, which is managed by the SRO Housing Development Fund Company, to pay for the acquisition, development and preservation of substitute low- and moderate-income housing. The requirement that property owners contribute to such a special fund has been held not to constitute an unconstitutional "taking". For example, the Court of Appeals in *Jenad, Inc. v Village of Scarsdale* (18 NY2d 78, 84 [1966]) upheld a local law that required a cash payment from a landowner to be used for public recreation as the only way in which said owner could avoid allotting part of his or her land for such purpose, and the court, in that case, noted that the required payment was "not a tax at all but a reasonable form of [community] planning for the general * * * good".

■ Based upon our analysis of the law and the facts *supra,* we find that Local Law No. 9 is constitutional in all respects, since it does not either constitute an unconstitutional taking of property or violate due process, in view of the fact that the provisions of that law are intended to accomplish the legitimate governmental goal of preventing homelessness, and do not deny the plaintiffs the opportunity to earn a reasonable rate of return on their property *(see, Agins v Tiburon, supra).*

We further find that this law is constitutional, in that there can be no unconstitutional taking of property where the law provides for, not necessarily the highest economic use, but does provides for an economically viable use. Further, as set forth *supra,* Local Law No. 9 contains a hardship provision *(see,* Administrative Code § 27-198.2 [d] [4]), which permits an

SRO owner to seek exemption from this law, upon application to the Commissioner of HPD, who is given the power to grant such relief.

In fact, it would seem that at least some of the plaintiffs appear to have a meritorious argument for such relief and we urge they consider applying for such exemption.

■ Some of the plaintiffs in these consolidated actions contend that Local Law No. 9 allegedly violates the State and city environmental laws, such as SEQRA, CEQR and ECL. This contention is meritless, since we find that Local Law No. 9 merely seeks the maintenance and/or repair of existing structures and facilities, without substantially altering them, and these plaintiffs have presented no persuasive evidence to the contrary. Therefore, since SEQRA, CEQR and ECL only require an environmental review when an action is undertaken which involves substantial changes in existing structures or facilities, we find that the action to be undertaken by the city, pursuant to Local Law No. 9, is exempt from such review (see, ECL 8-0105 [5] [iii]; CEQR § 4 [f]).

We have reviewed the other contentions of the parties in these three consolidated actions, and find them to be without merit.

Accordingly, order and judgment (one paper), Supreme Court, New York County (David B. Saxe, J.), entered March 16, 1988, which, inter alia, declared invalid various provisions of Local Laws, 1987, No. 9 of the City of New York, and enjoined the city from implementing or enforcing them, is unanimously reversed, on the law and on the facts, the injunction is vacated, and Local Law No. 9 in its entirety is declared constitutional, without costs (action No. 1, index No. 20891/1986).

Order and judgment (one paper) of the same court and Justice, entered March 16, 1988, which granted the cross motion of the defendants, City of New York et al., for summary judgment, to dismiss the complaint, is affirmed, without costs or disbursements (action No. 2, index No. 04016/1987).

Order and judgment (one paper) of the same court and Justice, entered March 16, 1988, which, inter alia, declared various provisions of Local Laws, 1987, No. 9 of the City of New York invalid, and enjoined the city from implementing or enforcing them, is unanimously reversed, on the law and on the facts, the injunction is vacated, and Local Law No. 9 in its entirety is declared constitutional, without costs (action No. 3, index No. 7247/1987).

CARRO, ASCH and ELLERIN, JJ., concur.

Orders and judgments (two papers), Supreme Court, New York County, both entered on March 16, 1988 (actions Nos. 1 and 3), unanimously reversed, on the law and on the facts, the injunction is vacated, and Local Law No. 9 in its entirety is declared constitutional, without costs and without disbursements.

Order and judgment (one paper), Supreme Court, New York County, entered on March 16, 1988 (action No. 2), unanimously affirmed, without costs and without disbursements.