Vᴇʀɴɪᴄᴇ Aᴋᴘᴀɴ et al., Appellants, v Eᴅᴡᴀʀᴅ I. Koᴄʜ, as Mayor of the City of New York and as Chairperson of the Board of Estimate of the City of New York, et al., Respondents.

First Department, November 21, 1989

## APPEARANCES OF COUNSEL

*Roger Juan Maldonado* of counsel *(John C. Gray, Jr., Jane Greengold Stevens, Raun J. Rasmussen, Russell Engler* and *Andrew Scherer* with him on the brief; Brooklyn Legal Services Corp. B. and Community Action for Legal Services, attorneys), for appellants.

*Dana Martine Robbins* of counsel *(Larry A. Sonnenshein* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for Edward I. Koch and others, respondents.

*Richard C. Seltzer* and *Stanley N. Alpert* of counsel *(Kaye, Scholer, Fierman, Hays & Handler,* attorneys), for Rose Associates, respondent.

*Mitchell S. Bernard* and *William W. Buzbee* for Natural Resources Defense Council, *amicus curiae.*

## OPINION OF THE COURT

Ross, J.

In order to revitalize downtown Brooklyn, the City of New York (City) created the Atlantic Terminal Urban Renewal Area and the Brooklyn Center Urban Renewal Area, in 1968 and 1970, respectively. The Atlantic Terminal Project (ATP), which was planned in 1978, overlaps both of those renewal areas, and is located on approximately 24 acres of mostly vacant land, near the Long Island Railroad Terminal on Atlantic Avenue. Thereafter, in 1985, the City, acting through the New York City Public Development Corporation, entered into a sole source agreement with a private builder, Rose Associates (Rose), to develop this land.

The proposal, for the 24-acre ATP site, includes a mix of residential and commercial uses. When complete, the ATP is to contain, *inter alia,* 4.5 million square feet of commercial space, two large office towers, movie theaters, a supermarket, and parking garages. Furthermore, the residential component of the ATP is to contain 641 units of condominium-type housing which is earmarked for families and individuals whose annual income ranges from $25,000 to $48,000. This housing is to be constructed in conjunction with the New York City Housing Partnership (Partnership), a nonprofit organization, and the Partnership is to apply for Urban Development Action grants to provide Federal subsidies for 273 of the 641 units. Moreover, it is anticipated that another 182 units will be eligible for State subsidies under New York State's Affordable Home Program.

On June 18, 1986, Community Board Number 2 recommended approval of the ATP.

A review of the environmental impact of the proposed ATP was commenced by the City, pursuant to the New York State Environmental Quality Review Act (SEQRA), which is found in ECL 8-0101 *et seq.* and Mayoral Executive Order No. 91, dated August 24, 1977, which is also referred to as the New York City Environmental Quality Review (CEQR). CEQR implements SEQRA in the City of New York. According to the provisions of CEQR, the Department of Environmental Protection (DEP), and the Department of City Planning (DCP), were designated as colead agencies concerning the ATP, with re-

sponsibility for preparation of the necessary environmental impact statements.

Thereafter, the DEP and DCP, as the colead agencies, supervised the preparation, in accordance with the requirements of SEQRA, of a draft environmental impact statement (DEIS), and on June 25, 1986, a notice of a public hearing by the City Planning Commission (CPC), to be held on July 9, 1986, to consider the DEIS, was published in the New York Post. Although this public hearing was held on July 9, the period for public comments remained open through July 21, 1986. At the public hearing, several comments and opinions were raised as to the effect of the ATP on low-income housing in the surrounding area, and, therefore, in order to address that concern, the CPC ordered additional surveys to be included in the final environmental impact statement (FEIS). Subsequently, the DEP and DCP issued, on August 8, 1986, a final notice of completion of the FEIS.

On October 9, 1986, following another public hearing, the Board of Estimate (BOE) approved the ATP, as well as the FEIS, zoning changes, amendments to the urban renewal plan, and the conveyance of land pertaining to it.

We recently stated, in *Coalition for Responsible Planning v Koch* (148 AD2d 230, 235 [1st Dept, June 27, 1989]), that "SEQRA does not require that every conceivable alternative must be considered before an FEIS will be considered acceptable and the degree of detail with which each alternative must be discussed will, of course, vary with the circumstances and nature of each proposal. *(Webster Assocs. v Town of Webster,* [59 NY2d 220,] 228; *Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805.)"

Subsequently, by summons and verified complaint, the plaintiffs, who are collectively a coalition of residents who reside in downtown Brooklyn near the proposed ATP, commenced, in February 1987, in the Supreme Court, New York County, an action against various City officials and agencies and Rose for declaratory and injunctive relief to annul the BOE's approval of the ATP. Our examination of the complaint indicates that, in substance, it alleges: BOE's approval violated the SEQRA, in that the lead agency is required to be the one which has the ultimate decision-making power over the project; the defendants failed to consider the secondary displacement effect of the ATP on the low-income residents of the surrounding areas, since the ATP will generate a signifi-

cant number of new jobs, which will cause a rise in rent levels, due to the competition between the newly employed workers and existing low-income residents for the scarce housing; the ATP will accelerate the displacement of low-income residents, by resulting in a general rise in real estate values; the FEIS did not consider the effect of the ATP on low-income families, who live in one- or two-family dwellings, which are not protected by either rent control or rent stabilization; and the City defendants failed in their affirmative duty, under the New York State Constitution and statutes, to provide low-income housing.

After joinder of issue, the defendants moved for summary judgment.

■ In a well-reasoned opinion, the IAS court granted that motion, and dismissed the complaint. We agree.

The plaintiffs contend that the defendants' failure, in plaintiffs' opinion, to adequately provide for the housing needs of the low-income residents of the ATP area, automatically means that no plan of the defendant City officials and agencies can ever be deemed to be well considered. We reject that contention, since it is simply not the law. In *Asian Ams. For Equality v Koch* (128 AD2d 99, 118 [1st Dept 1987], *affd* 72 NY2d 121 [1988]), we held that when municipal authorities adopted zoning changes, as a result "of a well-considered plan that took many factors into consideration, including the needs of the low-income residents of the area, and such plan was properly adopted", those zoning changes met the demands of the law. To put it another way, there is no affirmative obligation imposed upon municipal authorities to provide for the housing needs of low-income residents, which obligation is over and above that of properly adopting a well-considered plan, which meets, *inter alia,* environmental requirements, as enacted by the Legislature.

We endorse the position that the need for low-income housing should be addressed by government, but the law does not mandate the same. In our system of government, based upon a separation of powers, the judicial role is clearly defined. Therefore, "[i]t is not for us—as a court—to substitute our judgment for that of the Legislature * * * *(see, Matter of Voelckers v Guelli,* 58 NY2d 170, 177 [1983])." *(Asian Ams. For Equality v Koch, supra,* at 118.)

It is well-established law that a court's review of administrative actions is strictly limited to a determination as to

whether such action is arbitrary and capricious or an abuse of discretion *(see, Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359 [1986]; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400 [1986]).

The defendants' action, under SEQRA, "must be viewed in light of a rule of reason" *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 417). The BOE has wide latitude in concluding which alternative to accept, and mere disagreement with the plan promulgated does not make its action arbitrary, capricious, unsupported by substantial evidence or irrational.

The Court of Appeals in *Matter of Jackson v New York State Urban Dev. Corp. (supra,* at 417) held: "[A court's] inquiry is tempered in two respects. First, an agency's substantive obligations under SEQRA must be viewed in light of a rule of reason. 'Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA' *(Aldrich v Pattison,* 107 AD2d 258, 266 * * *; *Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805 * * *). The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal *(see, Webster Assoc. v Town of Webster,* 59 NY2d 220, 228). Second, the Legislature in SEQRA has left the agencies with considerable latitude in evaluating environmental effects and choosing among alternatives *(see, e.g.,* ECL 8-0109 [8]). Nothing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency's choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence *(Aldrich v Pattison,* 107 AD2d 258, 267, *supra; see also, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council,* 435 US 519, 555)."

It is not the role of this court to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 417).

When we apply the standard of judicial review, discussed *supra,* to the ATP, we find that defendant City officials and agencies did not abuse their discretion or act arbitrarily or capriciously, since their approval was as a result "of a well-

considered plan that took many factors into consideration, including the needs of the low-income residents of the area, and such plan was properly adopted" *(Asian Ams. For Equality v Koch, supra,* 128 AD2d, at 118). In this connection, we adopt the finding of the IAS court that "The housing component of the ATP plan provides for subsidized housing for an element of the community which also requires consideration— the moderate income family".

█ Respectfully, we disagree with the dissent, which finds that the defendant City officials and agencies did not pay sufficient attention to the issue of the secondary displacement effects of the ATP on surrounding areas. Once more, we adopt the finding of the IAS court, which states, in pertinent part: "defendants contend that when they reviewed the DEIS and determined that additional information on secondary displacement was required, they conducted a survey of the area and also introduced new computer generated data. Defendants contend that 80% of the residents in the ATP area are protected by either rent control or rent stabilization and as a result, will not be threatened with displacement as a result of the ATP. As to the remainder of the residents living in one and two family homes, defendants contend that since these homes are likely to be owner-occupied, the residents of these homes will also not be affected by the ATP".

Although the plaintiffs and the dissent contend that defendants failed to identify and address the secondary displacement issue as a "relevant area of environmental concern", the record is to the contrary. The fact that defendants concluded that the significance of the secondary displacement was minimal, does not mean defendants did not consider secondary, and long-term effects of this project and the potential impact on the surrounding community *(Chinese Staff & Workers Assn. v City of New York, supra).* SEQRA does not require an agency to impose every conceivable mitigation measure or any particular one *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 422).

The dissent argues that defendants did not take a "hard look" at the possibility of secondary displacement. But the record indicates that this was considered in the FEIS, and defendants concluded that the secondary displacement would not be significant. The fact that plaintiffs disagree with the conclusion reached, does not prove that defendants did not take a "hard look" *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 422). Further, the BOE received

evidence that well in excess of 80% of the residents would not be affected by any secondary displacement. This total consists of about 60% protected by rent laws, and the remainder being owner-occupied one- and two-family homes.

■ Based upon our review of the record, we find nothing wrong with the use by the BOE and CPC, which were the ultimate decision-makers concerning the ATP, of the lead agencies, DEP and DCP, as investigative arms, since those agencies had the technical expertise necessary to prepare a DEIS and FEIS. In pertinent part, the Court of Appeals stated, in *Matter of Jackson v New York State Urban Dev. Corp. (supra,* at 427), "Nothing in SEQRA bars an agency [who has the ultimate decision-making authority] from relying upon information or advice received from others, including consultants or other agencies, provided that the reliance was reasonable under the circumstances".

Following our hearing of this appeal, the Court of Appeals decided *Matter of Coca-Cola Bottling Co. v Board of Estimate* (72 NY2d 674 [1988]). The primary issue decided in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra)* was whether the BOE properly determined if a recycling business, which is located on a site in Bronx County, had an environmental impact on the surrounding area. In that case, the Court of Appeals held that the BOE procedure, in approving the subject recycling business, violated SEQRA, since the BOE, in substance, relied on a conditional negative determination made by DEP, which meant that no environmental impact statement (EIS) was required, and, accordingly, none was prepared by DEP for BOE to review.

Our examination of Chief Judge Wachtler's opinion, for a unanimous court, in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra)* indicates that the BOE procedure, in carrying out its duty under SEQRA in that case, was exactly contrary to the procedure it followed in the instant case, where, as mentioned *supra,* a DEIS and a FEIS were prepared.

Significantly, in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra,* at 681), there was a specific factual finding by the trial court that the DEP, and not the BOE, had made the required final environmental impact determination, and we affirmed that finding *(Matter of Coca-Cola Bottling Co. v Board of Estimate,* 135 AD2d 404 [1987]). In the case before us, the IAS court specifically found the BOE made the final determination as to the environmental impact of the ATP.

Moreover, we adopt the IAS court finding that "[t]he DEIS and FEIS were ultimately reviewed by the relevant decision-making authorities * * *. In the case at Bar, the DCP and the DEP [merely] functioned as experts for the Board of Estimate".

In other words, in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra),* the BOE violated the spirit of SEQRA by failing to promulgate a final policy decision to permit the project to proceed, but rather permitted the final determination to be made by another agency (DEP). In the case before us, the BOE did make the final determination, as required by statutory and case law. In *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra),* the Board of Estimate insulated itself from consideration of the environmental factors to be considered. Here, the Board of Estimate carried out its responsibility as required by SEQRA, and made the final policy decision to go forward with the project.

Finally, in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra,* at 682-683), the Court of Appeals held: "To be sure, the lead agency under SEQRA is likely to be nonexpert in environmental matters, and will often need to draw on others. The statute and regulations not only provide for this, but strongly encourage it *(see,* ECL 8-0109 [3]; 6 NYCRR 617.3 [i]; 6 NYCRR 617.4 [c]). Of particular interest here, the regulations specifically advise agencies to 'seek the advice and assistance of other agencies' regarding 'recommendations on the significance or nonsignificance of actions' (6 NYCRR 617.4 [c] [2]). Nevertheless, the final determination on this issue must remain with the lead agency principally responsible for approving the project".

In view of our analysis *supra,* we find that the dissent's reliance on *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra)* to support its contention that the BOE improperly approved the ATP is misplaced, since the facts in *Matter of Coca-Cola Bottling Co. v Board of Estimate (supra)* indicate the procedure used therein by the BOE was entirely different from the procedure used herein.

This court finds little fault with the dissent's compassionate analysis of the social implications of so massive a project. However, a court is very limited in what it can do relative to "social implications", when controlling statutory or case law may be to the contrary, and the governmental action taken is not arbitrary, capricious or irrational.

We have considered the other contentions of the plaintiffs, and find them to be without merit.

Accordingly, order, Supreme Court, New York County (David B. Saxe, J.), entered May 16, 1988, which granted defendants' motion for summary judgment, and dismissed the complaint in its entirety, is affirmed, without costs.

MURPHY, P. J. (dissenting). Defendant Rose Associates has been awarded a contract by the New York City Public Development Corporation to develop a 24-acre parcel of real estate owned by the City in downtown Brooklyn at the intersection of Atlantic and Flatbush Avenues, the site of the old Atlantic railroad terminal. The Atlantic Terminal Project (ATP),[1] as it has come to be called, will, as presently conceived, be made up of large residential and commercial components. Planned for the project are over 600 owner-occupied housing units and some 4.5 million square feet of office and other commercial space. The project is to include a multiscreen cinema with seating for nearly 4,000, a health club and a supermarket, as well as parking facilities for nearly 2,000 vehicles. It is the largest such development planned for New York City's outer boroughs and its promoters have not hesitated to claim that it will have far-reaching consequences for the surrounding communities. Indeed, Rose Associates states near the outset of its appellate presentation, "[T]he ATP—to be located close to the neighborhoods of Fort Greene, Clinton Hill, downtown Brooklyn and Boerum Hill—represents the area's chance for a long-awaited revival."

It has not been disputed that the project is one which will have a significant effect on the "environment" as that term is defined in the State Environmental Quality Review Act (hereinafter SEQRA). Accordingly, an environmental impact statement (EIS) was prepared as a condition of the project's approval by the Board of Estimate, which approval was voted by the Board on October 9, 1986. Plaintiffs, thereafter, commenced this action seeking to have that approval nullified.[2]

---

1. The project, although referred to herein as the Atlantic Terminal Project (ATP), is actually composed of two related developments—one to be situated at the site of the Atlantic Terminal and another, the Brooklyn Center Project, to be situated nearby. The two developments were covered together in the EIS at issue.

2. They also seek nullification of the Community Planning Commission's August 18, 1986 approval of the various land use modifications necessary for the project to go forward. These, too, were conditioned upon the preparation and review of an EIS.

They claim that the environmental review of the project and the resulting EIS did not adequately consider the project's socioeconomic effects, and that this failure was but one part of a larger failure by the Board of Estimate to discharge its responsibilities as a decision-making agency under SEQRA. I believe that plaintiffs' arguments possess merit and, therefore, dissent from this court's determination to affirm the dismissal of their complaint.

The basic purpose of SEQRA is to incorporate the consideration of environmental factors into the decision-making processes of government agencies at the earliest possible time (see, e.g., 6 NYCRR 617.1 [c]). Toward this end SEQRA establishes a set of procedures designed to assure that an action's potentially significant environmental consequences are disclosed from the inception of the planning process. Disclosure under SEQRA is accomplished primarily by means of environmental impact statements circulated first in draft and later in final form. These statements are supposed to provide a detailed exposition of an action's short- and long-term effects (ECL 8-0109 [2] [b]; 6 NYCRR 617.14 [f] [3]), including any unavoidable adverse environmental consequences (ECL 8-0109 [2] [c]; 6 NYCRR 617.14 [f] [4]). Where adverse consequences have been identified, mitigation measures must be proposed (ECL 8-0109 [2] [f]) and implemented, for in addition to requiring disclosure the statute commands that "[A]gencies * * * shall act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process" (ECL 8-0109 [1]).

The initial determination as to whether an action is of sufficient environmental significance to warrant an EIS rests with the lead agency (ECL 8-0109), i.e., the government agency "having principal responsibility for carrying out or approving such action" (ECL 8-0111 [6]). If an EIS is required, the involvement of the lead agency continues; the lead agency must itself prepare or cause the preparation of the draft EIS (ECL 8-0111 [6]; 6 NYCRR 617.2 [v]; 617.8 [a]). And, although the preparation of the draft EIS may be delegated by the lead agency to the applicant (ECL 8-0109 [3], [4]), the lead agency must nevertheless remain sufficiently involved in the underlying review process to render its own evaluation of the impact statement produced. For, "[N]otwithstanding any use of outside resources or work, agencies shall make their own inde-

pendent judgment of the scope, contents and adequacy of an environmental impact statement" (ECL 8-0109 [3]). Indeed, the lead agency must find the draft EIS satisfactory with respect to scope, content and adequacy before an application for project authorization may be deemed complete (ECL 8-0109 [5]; 6 NYCRR 617.8 [b], [c]). And, after the comment period and any public hearings deemed appropriate by the lead agency, the lead agency must reevaluate the EIS to determine in what way, if any, the draft should be revised or supplemented so as to address adequately issues raised by the comments (see, ECL 8-0105 [7]; 8-0109 [2]; 6 NYCRR 617.8 [g]; see also, Aldrich v Pattison, 107 AD2d 258). It is the lead agency alone that is responsible for the adequacy and accuracy of the final EIS, regardless of who prepares it (6 NYCRR 617.14 [i]). Thus, at the conclusion of the review process, after the lead agency has filed its notice of final EIS completion (see, 6 NYCRR 617.10 [f]) and the final comment period has expired (see, 6 NYCRR 617.9), but prior to any final decision authorizing an action, the lead agency must make express findings that SEQRA's requirements have been met and that "consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided" (ECL 8-0109 [8]; 6 NYCRR 617.9 [c]).

"Environment" is a term broadly defined by SEQRA. In addition to certain physical properties such as land, air and water ordinarily understood to be within the concept, the statute includes "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character" (ECL 8-0105 [6]). In assessing an action's impact upon the "environment" then, a lead agency will necessarily find itself drawn into a consideration of the action's socioeconomic ramifications (see, 6 NYCRR 617.14 [f] [1]).

As noted, plaintiffs' initial claim is that the environmental review of the ATP's socioeconomic consequences was inadequate. Specifically, plaintiffs urge that the project's potential to accelerate the displacement of low- and moderate-income residents of areas surrounding the project site was not satisfactorily addressed. It is plaintiffs' fear that the ATP will further stimulate already rising property values in the neighborhoods surrounding the project site, neighborhoods in which they, the individual plaintiffs, reside. They postulate that

sharp increases in real estate values will occasion similarly sharp increases in rents, increases which tenants of limited means like themselves will be unable to afford. In sum, they fear that the project will intensify the already considerable pressures upon them to vacate their homes and neighborhoods in favor of those able to meet the unsentimental demands of a rapidly rising market.

The phenomenon plaintiffs describe, known as secondary displacement to distinguish it from the direct or primary displacement of those whose immediate removal is necessary to make way for a project, is by now well recognized by scholars of the the urban environment.[3] It is, however, of more than academic concern. Displacement from one's home is a severe hardship even when there is alternative housing available. When there is not, it constitutes a deprivation no less grievous than that of homelessness. The housing emergency in New York City has been widely acknowledged and it is not disputed that there is virtually no housing available for displaced tenants without substantial financial resources. Thus, while there is undeniably much to be said for the gentrification of depressed neighborhoods, for those neighborhood residents economically excluded from the gentrification process, it is something which may inspire well-justified dread of an uprooted existence in which the most basic human needs go unmet; an existence in which physical and mental health are often imperiled and the maintenance of the family unit is rendered a heroic if not impossible task.

The laws of this State have not been insensitive to the plight of those who by virtue of having little are placed in jeopardy of losing all before the unrestrained progress of urban gentrification. The law is clear that the potential of a proposed action to cause or accelerate the displacement of local residents must be assessed during the environmental review process. Indeed, the Court of Appeals has held squarely that "[t]he potential acceleration of the displacement of local residents and businesses is a secondary long-term effect on population patterns, community goals and neighborhood character such that CEQR [Executive Order No. 91 implementing SEQRA in New York City] requires these impacts on the environment to be considered in an environmental analysis." *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d

---

3. An extensive bibliography on the subject is included in the record.

359, 367.)[4] The parties to the present litigation do not dispute that secondary displacement issues had to be considered in any environmental analysis of the ATP. What is disputed is whether the mandated consideration was in fact given. The resolution of this issue and the related issue of whether the decision-making agency fulfilled its statutory obligations in connection with the environmental review process requires some discussion of that process and the resulting EIS.

Executive Order No. 91, executed by Mayor Beame on August 24, 1977, and titled City Environmental Quality Review (hereinafter CEQR), implements SEQRA in New York City and provides in relevant part that "Lead agencies means the Department of Environmental Protection [hereinafter DEP] and the Department of City Planning [hereinafter DCP] of the City of New York" (CEQR § 1 [k]). Accordingly, when a City agency is planning an action for which an EIS is required, it has been the City's practice to have DEP and DCP prepare or supervise the preparation of the EIS, even though DEP and DCP generally possess no authority to approve or carry out the actions they are assigned to evaluate. In the present case, DEP and DCP assumed the lead agency responsibilities with which they were charged under the CEQR and, thereafter, delegated the task of preparing the EIS to the applicant developers.[5] The developers, in turn, retained an environmental consulting firm to do most of the actual work on the EIS.

The draft EIS produced by the developers' consultants, although including in various connections some factual material relevant to the secondary displacement issue, did not do so in the context of any organized discussion of secondary displacement. Indeed, there is nothing resembling a coherent and detailed analysis of the proposed project's potential to cause or accelerate secondary displacement anywhere in the draft EIS. The draft EIS was nevertheless found adequate by DEP and DCP which issued a notice of the draft's completion on April 14, 1986 (see, 6 NYCRR 617.8 [c]; CEQR § 10).

---

4. Although *Chinese Staff & Workers Assn.* was decided on the basis of CEQR § 6 (a) (5), applicable here as well, commentators have observed that the same result appears warranted by SEQRA's parallel provisions (see, Weinberg, 1987 Supp Practice Commentaries McKinney's Cons Laws of NY, Book 17½, ECL C8-0109:3, 1989 Pocket Part, at 17-18).

5. The "developers" are the Public Development Corporation (PDC), the City Department of Housing Preservation and Development, and the private developer, Rose Associates.

Comments upon the draft EIS focused on its failure to deal with the secondary displacement question. One comment in particular expressed the view that the project would accelerate upscale trends in Fort Greene and Prospect Heights, causing sharper than expected rises in property values and rents. It was the commentator's opinion that this intensification of the real estate market would lead to the displacement of large numbers of low- and moderate-income tenants currently residing in areas proximate to the project site. Particular concern was expressed for two groups: (1) SRO residents and (2) renters in buildings having fewer than six units who were, therefore, unprotected by rent stabilization. The comment noted that the issue of secondary displacement had been raised at the NEPA scoping which took place on July 31, 1985, some 8½ months before the draft EIS was filed, but that the draft did not address the issue much less provide for mitigation of adverse impacts which proper analysis might have disclosed.

The draft response to this comment composed by the developers' consultants concluded: "The proposed project would not be reversing or modifying established land use and development trends in the study area, would not significantly affect the outlook for development in the future and, over the long term, would not be encouraging development activity which would not have occurred in the absence of the project. It would therefore, not be responsible for triggering significant secondary displacement."

This response was initially found inadequate by the DCP. By letter dated July 28, 1986, Mr. Joseph Ketas, Director of DCP's Environmental Review Mission, informed the Public Development Corporation that the draft response did not adequately address the specific issues raised in the comment, and that the information contained in the response did not sufficiently support its conclusions. A more detailed analysis was deemed necessary before it could be determined whether the potential secondary displacement impacts of the project would be significant and whether mitigation measures would, therefore, have to be proposed. Mr. Ketas described with considerable specificity the lines along which the secondary displacement analysis ought to proceed: "this analysis should provide the number and location of units in the surrounding area that would be most adversely affected. The number, location, and rent structure of buildings containing fewer than six units (and which are therefore *not* subject to rent stabiliza-

tion) and buildings containing Single Room Occupancy Units (SROs) should be provided, with an assessment of those blocks and areas that are likely to be most adversely affected. The impact assessment should be based on information obtained regarding the current rent structure of these units, whether SRO units would be eligible for protection, the location of these buildings in relation to the proposed project etc."

Mr. Ketas invited the applicant to obtain the information for the requested analysis from DCP's data base.

On August 1, 1986, just four days after the Ketas letter, the developers' consultants prepared a memorandum reporting on the data retrieved from DCP's computer. The memorandum reported that in a 13 census tract area surrounding the project site (the study area) there were 789 multiple dwellings with less than six units. These dwellings contained a total of 2,850 unstabilized units. Although the Ketas letter had requested very specific information as to the number and location of the most vulnerable units, no such analysis was performed. The consultants simply stated, "[A]t this time, it is not really possible to establish an accurate universe of potentially affected low and moderate income households in multiple dwellings with fewer than six units." Implicitly acknowledging, however, that the raw figures indicated a substantial vulnerability, the consultants suggested that certain "qualifiers" be kept in mind. They ventured that because there had been an over-all 13% vacancy rate in the study area in 1980, six years before, that "a portion" of the 2,850 unstabilized units were unoccupied. They also conjectured that an unstated number of tenants had "probably" been in occupancy since the 1960s and were, therefore, protected from displacement by the rent control laws. Finally, the consultants observed that it was "likely" that "a proportion" of the 789 buildings had already been upgraded to the point that they were beyond the means of low- and moderate-income tenants.

As to the SROs, the consultant's memorandum reported the presence of 395 buildings in the study area containing a total of 4,907 SRO dwelling units. The memorandum noted that many of these units were located very close to the project site. Again, however, the consultants expressed the view that the vulnerability was not as great as the raw data suggested. In support of this view, the consultants relied exclusively upon the protection then afforded the SRO housing stock by the City's temporary moratorium on SRO conversion, alteration or demolition.

After reviewing the consultants' memorandum, DCP determined that the disclosure of measures to mitigate secondary displacement was not required, or, in other words, that the ATP did not possess the potential to cause or accelerate significant secondary displacement.

On August 8, 1986, barely one week after the preparation of the consultants' memorandum, DEP and DCP issued a notice of final EIS completion.

As is here relevant, the final EIS indicated that for decades the neighborhoods surrounding the project site had been economically depressed. In recent years, however, the fortunes of those neighborhoods had improved, but the improvement had been gradual and uneven leaving many areas largely unaffected. The EIS observed, "[A]lthough this revitalization is currently attracting higher income people and has led to quality rehabilitation of numerous houses, the study area's neighborhoods are still characterized by a strong concentration of low to moderate income residents and selected parts of the study area remain characterized by conditions of considerable poverty." In 8 of the 10 census tracts studied in the EIS's socioeconomic characteristics section, the median income was below the Brooklyn average, and in two tracts adjacent to the project site a full 45% of the population lived below the poverty line. The project to be situated in the midst of these neighborhoods was, as noted, one of imposing dimensions and its anticipated impact upon the surrounding area was not understated. The EIS estimated that the project would bring 1,600 new residents to the area and accommodate 13,690 employees in a commercial complex which would provide "a significant boost to the overall Brooklyn economy through increased employment and resulting indirect effects." Indeed, according to the EIS, the ATP was to constitute the "southern anchor" of a vast corridor of residential and commercial development extending from the project site northward through the Brooklyn Civic Center to the waterfront under the Brooklyn and Manhattan Bridges. In this capacity, it was thought that the ATP, the most extensive of several projects planned for this corridor, would more firmly establish downtown Brooklyn as the third major office center in New York City, and the first outside of Manhattan. The EIS noted that "developer interest could be sparked in areas surrounding this corridor of development for further commercial and residential construction," and observed in several places that the proposed project was expected to "accelerate" or give "an

added boost" to the rehabilitation of residential properties and to make SROs near the development site more attractive for renovation.

These glowing forecasts of the project's effect upon development trends notwithstanding, the final EIS's only direct consideration of secondary displacement issues was contained in responses to comments occupying about 1½ pages of text. The most significant and inclusive of these responses was in all material respects identical to the draft response which only 10 days before issuance of the notice of final EIS completion had been found deficient by DCP for its failure to include information or analysis supportive of the conclusion that the ATP would have no significant secondary displacement impacts. The aforementioned data retrieved by the developer's consultants from DCP's data base at DCP's request was not disclosed in the final EIS. Indeed, the only allusion to that data came in the following reassuring sentence: "Further data collected on buildings in the nearby census tracts that could be potentially affected by the ongoing process of residential upgrading (multiple dwellings with under six units and buildings with SRO units) and additional field inspections confirmed that the potential effect of the project would not be significant."

On August 18, 1986, the Community Planning Commission (hereinafter CPC), having completed its review of the final EIS issued 10 days earlier, approved various zoning modifications necessary for the project to go forward and purported to make the written environmental findings required by SEQRA (see, ECL 8-0109 [8]; 6 NYCRR 617.9 [c]). The CPC's findings were adopted unchanged by the Board of Estimate when it finally resolved to approve the ATP on October 9, 1986. Hearings conducted by the Board of Estimate on September 25, 1986, and just before the vote on October 9, 1986, at which numerous speakers were allotted three minutes apiece to express diverse views on various aspects of the proposed project, did not induce the Board of Estimate to reexamine any part of the EIS or to vary in any way the environmental findings made a month and a half earlier by the CPC.

In assessing the adequacy of an agency's environmental analysis under SEQRA, courts may inquire to see whether the agency has identified the relevant areas of environmental concern, given them a "hard look" and provided a "reasoned elaboration" of the basis for its conclusions (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416-417; Aldrich v Pattison, 107 AD2d 258, 265; Coalition Against

*Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805; *H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232). Thus, while courts are not empowered to direct agencies to any particular conclusions *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 416), it is very much their function to ascertain whether, on the record presented in a given case, the conclusions reached by an agency may be viewed as reasonable.

Although raised relatively early in the environmental review of the ATP, the subject of secondary displacement does not appear to have captured the attention of the project planners until the very last days of the review process, and then only in a hastily composed response to comments which was not, in fact, responsive, either to the comments or to the legally relevant issue. Nowhere in the EIS or the underlying environmental review is there any indication that the secondary displacement issue received any meaningful analysis, much less a "hard look". Nor is there evidence supportive of the conclusion now advanced by respondents that the ATP will not significantly accelerate the displacement of surrounding residents.

The conclusion that the ATP will have no significant secondary displacement impacts would be striking, even if valid. On the one hand it is urged that the project will be crucial to the economic revitalization of the downtown Brooklyn area; that it will attract large numbers of new residents, businesses and employees to the midst of relatively depressed and even impoverished communities and, in so doing, help transform downtown Brooklyn into New York City's third major office center. On the other hand, although it is admitted at various points in the EIS that the project may "spark" developer interest in surrounding neighborhoods and that it may support and indeed "accelerate" ongoing trends toward residential upgrading, it is now urged that the ATP will not significantly increase the vulnerability of local residents to displacement. The presumption would, of course, be to the contrary. It would be expected that at least some significant portion of the area's considerable number of low-income residents would be rendered more vulnerable to displacement by the otherwise encompassing and transforming economic pressures predicted to be generated by the ATP. Possibly there are reasons why these residents will not be so affected, but they are not to be found in the subject EIS. Indeed, the EIS carefully avoids the issue.

The EIS, in fact, expresses no view as to whether the ATP will significantly heighten the vulnerability of local residents to displacement. Rather, it states that "over the long term" development in surrounding neighborhoods will occur with or without the project and concludes, therefore, that the project will not itself "trigger" secondary displacement. But surely the question to be addressed was not whether the ATP itself would "trigger" secondary displacement, but whether it would cause ongoing displacement producing trends to become more pronounced. Accepting for argument's sake the developers' rather remarkable assertion of their project's ultimate irrelevance to the development of downtown Brooklyn and neighboring areas—an assertion which, although perhaps convenient in the context of the EIS's discussion of secondary displacement, appears to be significantly at odds with numerous assertions elsewhere in the EIS—and assuming that a certain amount of secondary displacement will occur regardless of whether the project is constructed, it does not follow that the project's impact on the displacement of local residents will be insignificant. The project may very well hasten what would have been a relatively gradual process of displacement, causing an earlier than expected need for alternative housing. Certainly, this would not be an insignificant development to the affected residents, nor should its prospect have gone completely unaddressed by the decision-making agency charged with identifying and mitigating potential adverse environmental impacts. It was precisely such an effect that the Court of Appeals recognized had to be considered when it held in *Chinese Staff & Workers (supra,* 68 NY2d, at 367) that "[T]he potential *acceleration* of the displacement of local residents and businesses is a secondary long-term effect on population patterns, community goals and neighborhood character such that CEQR requires these impacts on the environment to be considered in an environmental analysis" (emphasis added), and it is just such an effect whose consideration is required by the regulations, which expressly provide that an EIS must include "a statement and evaluation of the environmental impacts of the proposed action, including * * * cumulative effects" (6 NYCRR 617.14 [f] [3]). The subject EIS, however, does not show that any consideration was given to the project's evident potential to augment preexisting displacement pressures.

The manifest failure of the EIS in this regard was, of course, recognized by DCP when, in evaluating the consul-

tants' draft response to comments, it stated that "the response * * * does not appear to address adequately the specific issues raised."[6] Nevertheless, 10 days after registering this criticism DCP, for reasons difficult to discern, changed its position and approved a final EIS including a discussion of secondary displacement practically identical to that which it had so recently rejected. Certainly, nothing which had transpired in the interim cured the essential irrelevancy of the consultants' approach to the secondary displacement question, nor did the aforementioned data gathered at DCP's request lend any rational support to the conclusion respondents would now have drawn from the EIS, i.e., that the project will not significantly accelerate the secondary displacement process.

As noted, the facts retrieved from DCP's data base at DCP's request showed that there were within the study area some 2,850 dwelling units unstabilized and, therefore, presumptively vulnerable to the sort of sharp rent increases that lead to displacement. In addition, the data showed the presence of 4,907 SRO units whose low-income occupants would be uniquely vulnerable to displacement pressures if the City's moratorium on SRO conversion or demolition were lifted or invalidated. The harsh reality is that these statistics indicated that there were literally thousands of people within the immediate vicinity of the proposed project potentially vulnerable to displacement pressures. Although the Ketas letter specifically requested "an assessment of those specific blocks or areas which are likely to be most adversely affected," the consultant's memorandum, hurriedly prepared just one week before the August 8, 1986 due date for the filing of the final EIS, was able to muster no more satisfactory response than "[A]t this time, it is not really possible to establish an accurate universe of potentially affected low and moderate income households in multiple dwellings with fewer than six units." Nor did the various qualifiers cited by the consultants provide much basis for comfort. The fact that there had six years previously been an over-all 13% vacancy rate in the study area did little to support the conclusion apparently embraced by the consultants that a significant portion of the unstabilized housing stock was currently vacant and, therefore, unsusceptible to displacement pressures. The vacancy data relied upon was, of course, very old and the consultants' implicit assertion of its continued validity appears to have been based

6. As noted, one of the issues specifically raised in the comments was the project's potential to accelerate the displacement of surrounding residents.

on nothing more than assumption.[7] Moreover, there is no indication that the over-all 13% vacancy rate figure had any relevance to the specific category of housing at issue, namely, multiple dwellings with fewer than six units. But assuming the validity of the consultants' assumption that the six-year-old 13% figure was indicative of some unspecified degree of vacancy in unstabilized units, this would not obviate the problem suggested by the hard figures, for even if as many as 50% of the units in question were vacant, there would still remain over 1,000 unstabilized units and, potentially, thousands of tenants vulnerable to displacement pressures. Nor does it seem reasonable, in the absence of any supporting data, for the consultants to have assumed that the number of possibly vulnerable units would be meaningfully reduced once the presumptively small number of rent-controlled units in the area was taken into account.[8] Finally, the likelihood that an unspecified portion of unstabilized units had already been upgraded and thereby removed from the low- and moderate-income housing market would not, even if substantiated, make the underlying problem any less considerable. If, indeed, established trends have already so diminished the availability of housing for renters of limited means, the consequences of any displacement caused or accelerated by the proposed project will be all the more severe.

To be stressed in evaluating the consultants' "qualifiers", is the fact that the hard data obtained from the City's computer showed very large numbers of potentially vulnerable units and by inference even larger numbers of potentially vulnerable tenants, and that even if these numbers were partially reduced in accordance with the consultants' various speculations, there has been no showing, nor has there even been a reasonably conscientious effort to show, by current reliable data that the reduction would be so substantial as to render insignificant the vulnerable tenant population in the area surrounding the project. It bears repetition that the consultants themselves acknowledged that they had not succeeded in establishing "an accurate universe of potentially affected low and moderate income households in multiple dwellings with

---

**7.** Indeed, its continued validity is highly suspect given the uncontroverted showing by plaintiffs that 1983 census data for Community District 2 in which the ATP is to be located discloses an over-all vacancy rate of just 2%.

**8.** It is well known that only a small proportion of the City's rental units are rent controlled.

fewer than six units." The acknowledgment is nothing less than a frank concession that the analysis specifically requested by DCP for the obvious reason that it was absolutely essential to assessing the project's secondary displacement potential had not been performed.

With respect to the SROs, as is now painfully evident the consultant's total reliance on the City's moratorium on SRO conversion, alteration or demolition to shield the 4,907 SRO units[9] in the study area from displacement pressures, was seriously misplaced. The City's moratorium, which in its latest incarnation was known as Local Laws, 1987, No. 9 of the City of New York (amending Administrative Code of City of New York § 27-198.2), has, of course, been struck down by the Court of Appeals as facially unconstitutional (Seawall Assocs. v City of New York, 74 NY2d 92) and will, therefore, not protect any SRO units. Local Law No. 9 was but the most recent in a series of similar stopgap measures intended to preserve, on a temporary basis, the City's rapidly dwindling SRO housing stock, housing whose importance as a last affordable refuge for the poor, elderly and infirm was only belatedly realized by the City. In July 1986, when the developer's consultants and DCP purported to consider the vulnerability of the SROs, the 18-month moratorium on SRO conversion, alteration or demolition imposed by Local Laws, 1985, No. 59 of the City of New York (adding Administrative Code § C26-118.10) had just been extended for six months to December 31, 1986, pursuant to Local Laws, 1986, No. 22 of the City of New York (amending Administrative Code § C26-118.10), but there were no concrete long-range plans yet formulated to address the highly problematic vulnerability of SRO tenants to displacement and homelessness. The consultants assumed that such plans would be forthcoming and that in the interim the City would continue to prohibit SRO conversion, alteration or demolition. They concluded, therefore, that SRO residents would not be significantly affected by the ATP. As it turned out, however, legal challenges to Local Law No. 22 materialized before the environmental review of the ATP had been completed, and in December 1986, the law was held to constitute a deprivation of property without due process of law violative of the Fourteenth Amendment of the US Constitu-

---

9. Even if the City's claim that only 56% of these units are being used as SROs is correct, the size of the potentially vulnerable tenant population is still staggeringly high, running well into the thousands.

tion and of article I, § 6 of the NY Constitution *(Seawall Assocs. v City of New York,* 134 Misc 2d 187). The ruling, issued near the expiration of the six-month moratorium imposed by the invalidated law, was not appealed by the City, which instead enacted Local Law No. 9. Despite its inclusion of provisions intended to mitigate the invidious aspects of Local Law No. 22, Local Law No. 9 met an identical fate; it, too, was held to be unconstitutional *(Seawall Assocs. v City of New York,* 138 Misc 2d 96). And, as noted, the unconstitutionality of Local Law No. 9 has of late been given final and decisive appellate confirmation by the Court of Appeals *(Seawall Assocs. v City of New York,* 74 NY2d 92, *revg* 142 AD2d 72, *supra).* In view of the fact that the moratoriums considered necessary to protect the remaining SROs from extinction have been so conclusively invalidated, the capacity of the City to shield SRO residents from displacement pressures, apparently assumed by the consultants, must be seriously questioned.

Although the demise of the City's prohibition on SRO conversion, alteration or demolition was not a foregone conclusion at the time of the environmental review of the ATP, neither was continuation of the prohibition so certain that its prospect alone should have rendered the underlying extreme vulnerability of SRO residents inconsequential. All that was certain in July of 1986 was that the moratorium was to be extended for six months. The mere possibility that there would be further temporary extensions was not sufficient to justify the conclusion that SRO residents would be effectively shielded from displacement pressures. Moreover, the legally problematic nature of the City's rather extreme, if well-intended, approach to preserving the SROs should have been evident: the moratorium legislation was eventually declared invalid on its face; its defect did not lie in some nuance of language or in an unanticipated application but in its manifestly gross intrusion upon the property interests of all SRO owners. This is not to say that reasonable men might not have differed as to the validity of the legislation, only that, regardless of their views, they would have understood that the future of the legislation was far from assured. There was, on the other hand, little doubt that if the legislation were invalidated, the existence of the City's remaining SROs would be seriously jeopardized. More specifically, there could have been no question that, deprived of protection, the SROs in the study area would succumb to the pressures of a real estate market driven, at least in part, by the ATP. The consultants did, after

all, note in their memorandum that the highest concentrations of SRO units in the study area were located in the blocks adjacent to the project site, and the EIS observed with characteristic understatement that, "SRO units near the development site may become more attractive for renovation than they are currently." To have relied exclusively upon yet unenacted and legally suspect extensions of a six-month moratorium, which was itself suspect, to neutralize the indisputably pronounced vulnerability of the many SRO tenants in the study area was not reasonable. The resulting determination that the proposed project held no significant potential for secondary displacement, hung upon little more than an assumption that a very real problem whose continued irresolution would have the most devastating consequences for thousands of people, would somehow be addressed by the City. But the vague prospect that an adverse effect will be addressed in some unspecified, indeed unascertained, way, does not render the effect insignificant for purposes of environmental analysis. If anything, the fact that the City was actively considering outside of the environmental review arena how it might insulate SRO residents from the displacing forces of the real estate market, was strong indication of the existence of a serious, indeed emergent, problem requiring mitigation. It was only by treating what at the time were hardly more than sympathetic intentions on the City's part as the equivalent of an affirmative plan offering substantial long-range protection to SRO residents, that the consultants were able to conclude that there was no problem at all. The situation is directly analogous to that presented in *H.O.M.E.S. v New York State Urban Dev. Corp.* (69 AD2d 222) where a vast domed sports complex was proposed to be situated amid neighborhoods unprepared to accommodate the increased traffic and demand for parking the complex was expected to generate. The lead agency determined that no EIS was required, relying in significant measure upon assurances that the City of Syracuse would eventually formulate a plan to deal with the vehicular congestion. The court annulled the negative determination, stating in relevant part: "[t]he record shows that UDC [the Urban Development Corporation] did not meet the legal requirements in arriving at its determination that the planned domed facility had no environmental significance on the area. Clearly UDC failed to take a 'hard look' at the problems and adverse potential effects of the project on traffic stoppage, parking, air pollution or noise level damage. *Not only did it*

*fail to analyze the traffic and parking problems entailed, but it vaguely recognized their existence and relied upon general assurances that after the problems developed the university and City of Syracuse would adequately mitigate them by some unspecified appropriate action" (supra,* at 232 [emphasis added]).

Obviously, general assurances that problems will be dealt with do not obviate those problems or the need to provide for their mitigation within the context of the environmental review process. It was, however, precisely upon such assurances, or worse yet, upon completely unsupported assumptions, that the consultants relied when they determined that the ATP would have no significant displacing effect on surrounding SRO residents. This court has now been invited to overlook this very fundamental analytic flaw based upon a further assurance: the City states in its appellate presentation that even if its moratorium legislation is not ultimately sustained, "it is reasonable to assume that other remedial legislation will be forthcoming". Perhaps, now that the moratorium legislation has been conclusively voided, the City will come forward with other remedial legislation, but that is very much beside the point. If, on the basis of such an assurance, it were appropriate to deem an otherwise serious problem insignificant, the environmental review process could be dispensed with altogether. Plainly, assurances and optimistic assumptions are not a substitute for the sober identification, investigation and proposed mitigation within the EIS of adverse environmental impacts. Where, as here, it was clear at the time of the environmental review that the only thing standing between SRO residents and displacement was the possible extension of a temporary and legally tenuous moratorium provision, the determination to treat as insignificant the project's potential to displace SRO residents based upon the bare assumption that something could and would be done to afford the SRO residents comprehensive and lasting protection, was arbitrary and capricious. It would, if possible, be even more arbitrary, and completely inappropriate, for this court to conclude that the City's present assurances render the problem inconsequential. Now that the moratorium legislation has been declared unconstitutional, it is highly questionable whether the City can do anything effectively to shield SRO residents against displacement. But it is, in any case, not for the court, in the first instance, to assess, much less assume, the adequacy of the City's unspecified alternative plans to

protect SRO residents. The measures proposed by the City to mitigate the evident hardships with which SRO residents are now generally confronted, and their particular application to the circumstances presented by the ATP, is something which should be disclosed and evaluated by the lead agency in the EIS.

Even if there is disagreement as to whether the initial assumption of continued moratorium protection for SROs was warranted, now that that crucial assumption has been conclusively shown to be erroneous, there should be no question that some reassessment of the project's effect on the surrounding SRO population is in order. The alternative, at least on the present record, would be to countenance the subjection of thousands of people already living on the margin to increased displacement pressures without any consideration of the consequences or concrete provision for their mitigation. This is a result both morally indefensible and completely contrary to SEQRA's command that "agencies * * * [give] due consideration * * * to preventing environmental damage" (ECL 8-0103 [9]). Indeed, the approval of the subject action was accompanied by required findings that "consistent with social, economic and other essential considerations from among the reasonable alternatives thereto, the action to be carried out, funded or approved is one which minimizes or avoids adverse environmental effects to the maximum extent practicable" (6 NYCRR 617.9 [c] [3]; ECL 8-0109 [8]; CEQR § 12 [b] [1]), and that "consistent with social, economic and other essential considerations of state and city policy, all practicable means will be taken *in carrying out* or approving the action to minimize or avoid adverse environmental effects" (CEQR § 12 [b] [2] [emphasis added]). These findings would be deprived of all significance if the present action were permitted to go forward on the basis of critical assumptions now known to be invalid. It has been recognized that "an agency must prepare a SEIS [supplemental EIS] if environmentally significant modifications are made after issuance of a FEIS [final EIS]" *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d, *supra,* at 429; *see also, Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484; *Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1034-1035). Likewise, when subsequent to the issuance of a final EIS it becomes known that fundamental assumptions employed in the environmental analysis are erroneous, there

exists a similar need for reevaluation (see, *Sierra Club v United States Army Corps of Engrs.*, 701 F2d, *supra,* at 1034).

The need for reevaluation of the secondary displacement issue at the agency level is additionally compelled by the circumstance that the information obtained by the consultants from DCP's data base was not disclosed in the EIS. As DCP recognized, the retrieval and analysis of that information was essential to any reasoned, factually based analysis of the secondary displacement issue. The omission of that information from the EIS, effectively deprived the decision-making agencies (CPC and BOE) of information absolutely necessary to the discharge of their statutory lead agency obligations (see, *infra,* at 142). It also deprived other interested agencies and the public (see, ECL 8-0109 [4]) of information critical to the meaningful exercise of their right to comment on the EIS. To the extent that the right to comment was compromised by the omission, so, too, was the quality of the environmental review process, for it is recognized that informed comment constitutes an essential safeguard against lead agency bias and error, and that it improves the lead agency's evaluation of the proposed project by helping it to identify problems (see, *Glen Head— Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d, *supra,* at 494, and the authorities cited therein).

Respondents attempt to excuse the omission of the data obtained by the consultants by citing *Matter of Jackson v New York State Urban Dev. Corp.* (67 NY2d 400, 422, *supra)* for the proposition that "[N]othing in the statute or regulations requires that an agency make raw data available to the public". This is, of course, true, but it assumes that the agency has otherwise discharged its broad disclosure obligation under SEQRA (see, *supra)* by reviewing relevant data and incorporating it into the analysis presented in the EIS. That did not happen here. As will be discussed further, the decision-making agencies (CPC and BOE) never saw the data, and the authors of the EIS made no attempt to incorporate the information within the EIS in an intellectually honest way. Indeed, notwithstanding the requirement that the EIS contain "a list of any underlying studies, reports and other information obtained and considered in preparing the statement" (6 NYCRR 617.14 [f] [11]; CEQR § 9 [d] [10]), the only acknowledgment of the data's existence in the EIS came as follows: "Further data collected on buildings in the nearby census tracts that could be potentially affected by the on-going process of residential upgrading (multiple dwellings with under six units and build-

ings with SRO units) * * * confirmed that the potential effects of the project would not be significant." If the EIS had said nothing about the data it would have been better than this highly misleading reference, for the data varied wildly from its description. On the present state of the record, there is absolutely no way to interpret the data benignly, much less as confirmation "that the potential effects of the project would not be significant". Accepting all of the consultants' qualifying conjectures, none of which was discussed in the EIS, the number of potentially vulnerable units disclosed by the data remains startlingly high *(see, supra,* at 133-134). Even without the nearly 5,000 SRO units which the consultants erroneously assumed would be protected, the data overwhelmingly indicated a substantial core of vulnerability involving thousands of tenants. To have characterized this data soothingly as confirmation that the project would have no significant effect is akin to calling white black.

Nor is it tenable, as respondents claim, that the omission of this data was harmless. The fact that there were comments upon the secondary displacement issue, did not release the lead agency from its obligation to itself consider the issue and any data necessary to its analysis. As noted, the lead agency never saw the data essential to the analysis of the secondary displacement issue. I do not think it fair to conclude that the decision-making agencies would have reached the same arbitrary conclusions as to the significance of the data as the developers' consultants. *Webster Assocs. v Town of Webster* (59 NY2d 220) cited by respondents to support their claim of harmless error, has no application here. *Webster* held only that the omission of a required item from a draft EIS could be cured by its inclusion in the final EIS and full public discussion. Certainly, *Webster* did not hold that the omission of critical data and analysis from both the draft and final EIS could be cured by public discussion alone.

Much of what has been said thus far respecting the lead agency's insulation from data essential to its mandated evaluation of the ATP's secondary displacement impacts, anticipates what is to come. For the insulation of the Board of Estimate, the agency principally responsible for approving the ATP, from information critical to its decision was but a function of a review process which consistently sheltered the proper lead agency from any but the most minimal involvement in the assessment of the ATP's environmental consequences. This was contrary to SEQRA's most fundamental

objective and to the procedures set forth in the statute and regulations designed to assure that that objective is achieved.

SEQRA commands that "[s]ocial, economic, and environmental factors shall be considered together in reaching decisions on proposed activities" (ECL 8-0103 [7]). It is thus evident that "SEQRA's fundamental policy is to inject environmental considerations directly into governmental decision making" *(Matter of Coca-Cola Bottling Co. v Board of Estimate,* 72 NY2d 674, 679 [Wachtler, Ch. J.]; *see also,* 6 NYCRR 617.1 [c], [d]; *Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d, *supra,* at 492; *Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 222, 226; Governor's mem, 1975 NY Legis Ann, at 438). The statute accomplishes this basic purpose by requiring, in essence, that the decision-making agency—the agency principally responsible for carrying out, funding or approving the proposed action (ECL 8-0111 [6])—also assume responsibility for assessing the action's environmental consequences. The statute recognizes that an action may involve many agencies, but mindful of the Legislature's basic injunction that "[s]ocial, economic, and environmental factors * * * be considered together" (ECL 8-0103 [7]), requires that one agency, the principal decision maker, bear responsibility for performing a comprehensive analysis of all relevant aspects of a project so that "the protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations in public policy" (ECL 8-0103 [7]). The principal decision maker is referred to throughout the statute and regulations as the "lead agency". The statute and regulations make elaborate provision for the selection of a lead agency at the inception of the decision-making process (ECL 8-0109 [4]; 8-0111 [6]; 6 NYCRR 617.6), and exhaustively detail the extensive responsibilities of the lead agency in connection with the ensuing environmental review. Those responsibilities have been discussed *(see, supra,* at 123-124) and require no further elaboration here. Suffice it to say, that by heavily concentrating the environmental review obligation in the lead agency, the statute seeks above all to avoid fragmentation of the decision-making process and thereby to assure that environmental factors will not be severed from the over-all mix of policy concerns relevant to the decision to be made *(see,* 6 NYCRR 617.3 [k]).

It is not disputed that the BOE and CPC were the agencies principally responsible for approving the ATP and that one of

them—most likely the BOE—should have been designated the lead agency for environmental review purposes. It is, however, clear that neither the BOE nor the CPC was so designated. Instead, DCP and DEP, agencies with no decision-making authority respecting the ultimate approval, funding or carrying out of the ATP, were the designated colead agencies. Their designation, although in accord with the CEQR's provision for permanent lead agencies, violated the statute's very clear requirement that the lead agency be one and the same as the principal decision maker. The City, while pointing to certain pragmatic advantages of the CEQR permanent colead agency arrangement, does not argue strenuously that the CEQR designation was consistent with the statute, for that it certainly was not. Rather, the City urges that the permanent colead agency designation was of mere nominal importance since, in reality, DEP and DCP did not act as lead agencies but as consultants to the BOE and CPC. The argument is, however, without factual basis. The record is devoid of any evidence that there was between the decision makers and the designated colead agencies anything resembling a consultative relationship. To the contrary, the record demonstrates irrefutably that DEP and DCP were not only named as lead agencies, but that they acted as such. Indeed, so thorough was their assumption of lead agency responsibilities that until the final stage of the environmental review they completely displaced the decision-making agencies, performing all of the nondelegable lead agency functions in connection with the preparation and issuance of the draft and final EIS. Thus, it was the improperly designated colead agencies, DEP and DCP, that reviewed and approved the draft EIS, and it was the same agencies that issued the notice of the draft EIS's completion. Similarly, DEP and DCP reviewed the comments upon the draft, passed upon the adequacy of the consultants' responses, and thereafter certified the final EIS to be complete. All of these supervisory functions are expressly committed by the statute and regulations to a properly designated lead agency (see, ECL 8-0109 [3], [5]; 6 NYCRR 617.8, 617.10). The agencies that could have appropriately served in a lead agency capacity, however, remained uninvolved with the review process. There is no evidence that either the BOE or the CPC played any role in the initial assessment of the project's environmental significance, nor is there evidence that either one participated in the scoping of the EIS. Finally, there is not the slightest indication that either agency had anything to do

with the preparation, evaluation or issuance of the EIS. Like other interested agencies and the public, the decision-making agencies were simply presented with a finished EIS in which they had had no hand.

SEQRA requires that its policies be implemented "to the fullest extent possible" (ECL 8-0103 [6]). Courts have, therefore, repeatedly held that SEQRA's provisions must be strictly abided: "[L]iteral compliance with both the letter and spirit of SEQRA is required and substantial compliance will not suffice". *(Inland Vale Farm Co. v Stergianopoulos,* 104 AD2d 395, 396, *affd* 65 NY2d 718; *see also, E.F.S. Ventures Corp. v Foster,* 128 AD2d 28, 34; *Aldrich v Pattison,* 107 AD2d, *supra,* at 264; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, 480-481; *Matter of Badura v Guelli,* 94 AD2d 972, 973; *Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d, *supra,* at 223.) The importance of literal compliance with SEQRA's lead agency requirements has recently been driven home by the Court of Appeals in *Matter of Coca-Cola Bottling Co. v Board of Estimate* (72 NY2d 674). At issue in *Coca-Cola* was the propriety of a conditional negative declaration (i.e., a conditional determination that no impact statement was required) issued by DEP in its capacity as a permanent colead agency. As in the present case, DEP's authority to act as a lead agency derived from the aforecited CEQR designation. In affirming the annulment of the project approval by the Board of Estimate, the court, in an opinion by Chief Judge Wachtler, first took note of the critical importance of the "lead agency concept" to the statute's central purpose: "The statute and its implementing regulations make elaborate provision for requiring consideration of the environmental effects of governmental decisions by the decision maker, primarily through the 'lead agency' concept" *(supra,* at 679). The court then observed that the statute's specific requirement that the lead agency determine whether the action "may have a significant effect on the environment" (ECL 8-0111 [6]) was transgressed when DEP rather than the agency principally responsible for approving the action, rendered the negative declaration. The court's analysis, however, did not end at this point; it continued to address the City's contention that even if SEQRA's language had been violated, the violation was but a variance in form permitted by the statute *(see,* ECL 8-0113 [3] [a]) and fully consonant with the statute's spirit. This contention was soundly rejected by the court: "SEQRA's core policy of injecting environmental consid-

erations directly into the policy-making decisions of governmental entities is fully implicated. The City's implementation of the statute here allowed the Board of Estimate—the governmental entity responsible for the final policy decision to proceed with a project—to be insulated from consideration of environmental factors. This violated a fundamental policy of SEQRA" *(supra,* at 681-682).

It is respondents' position in submissions to this court postdating the Court of Appeals decision in *Coca-Cola (supra),* that *Coca-Cola* is to be accorded the most narrow significance —that the case has application only in situations where a negative declaration has been issued by an agency without principal decision-making authority. I cannot agree that the case is to be given such a crimped reading. It would seem to me that *Coca-Cola* stands for the broad and very sound proposition that the decision maker must perform those non-delegable tasks assigned it by the statute and implementing regulations, not only for the perfectly sufficient reason that the statute's express commands must be followed strictly, but also to assure that the lead agency will not be insulated from the consideration of environmental issues.

In support of its reading of *Coca-Cola,* the City argues that it addresses a unique circumstance in which, due to the negative declaration, no EIS is prepared and the lead agency, therefore, never reviews an EIS. Curiously, the City argued in defense of its practice of having nondecision makers issue negative declarations, that this practice did not insulate the lead agency from environmental concerns since there were no environmental factors to consider *(see,* 72 NY2d, *supra,* at 682). Are we to understand that where, as here, there most certainly are environmental factors to consider and an EIS is prepared that the mandated participation of the lead agency in the environmental review is any less crucial than it was held to be in *Coca-Cola?* Obviously, *Coca-Cola* does not mean that once a positive declaration has been issued the lead agency may rest upon its laurels and await the receipt of the final EIS. What *Coca-Cola* states quite clearly is that even in a situation where a proposed action may have no significant environmental consequences, the decision maker itself must still assess the action's environmental implications. A fortiori, where the action is one with indisputably significant environmental impacts, it is absolutely essential for the lead agency scrupulously to discharge its critically important review obligations, especially those respecting the preparation of the EIS.

Otherwise, the lead agency may be insulated from important environmental concerns notwithstanding its receipt and perusal of a final EIS. This is particularly true where the EIS is prepared by the project applicant. As one commentator has so aptly observed: "Applicants are interested in proceeding with their projects in the manner initially proposed by them. This incentive may produce a distortion of the factual situation, and may result in the omission of certain environmental problems, the exclusion of alternatives attractive to society but not to the applicant, and a skewed perspective on the overall balance of environmental benefits and costs associated with each option. The requirement that agencies make their own independent judgment of the adequacy of an impact statement helps mitigate the effects of this bias." (Orloff, *SEQRA: New York's Reformation of NEPA,* 46 Alb L Rev 1128, 1140.)

Here, the proper lead agencies could not have gathered from the misleading EIS that that highly relevant data excluded from the EIS was fundamentally irreconcilable with the EIS's claim that the ATP would have no significant secondary displacement effects. Had the proper lead agencies maintained the requisite involvement in the environmental review process they would certainly have acquired the information necessary to "make their own independent judgment of the scope, contents and adequacy of [the] environmental impact statement" (ECL 8-0109 [3]). They would have performed the initial assessment of the project's significance and participated in the scoping of the EIS, and they would have used the information thus acquired in reviewing the draft EIS *(see,* 6 NYCRR 617.2 [ff]; 617.8 [b] [1]). They would also have reviewed the final EIS and the responses to the comments contained therein. In the course of so doing, they would undoubtedly have learned of the information uncovered by the developers' consultants and would have had an opportunity independently to judge the adequacy of the EIS in its light. Having abstained from any involvement in the underlying review process and having deferred to agencies without any responsibility or accountability for the final decision to be made, the proper lead agencies were without the basic information necessary to determine whether the fundamental disclosure obligation imposed by SEQRA had been adequately discharged, or to evaluate the adequacy of the environmental analysis of the secondary displacement issue. There can be no better example of how deviation from SEQRA's lead agency

requirements can insulate a responsible lead agency from giving "appropriate weight" *(see,* ECL 8-0103 [7]) to environmental factors in its decision making.

I reach the conclusion that the Board of Estimate's approval of the ATP must be nullified reluctantly. The project is one with much to recommend it. Brooklyn and the City generally are certainly much in need of the more than 600 units of subsidized moderate-income housing that the developer proposes, and the economic revitalization of downtown Brooklyn predicted to be generated in substantial part by the project holds great promise. We cannot, however, in eager anticipation of the project's benefits cast a blind eye on its potential environmental detriments. At a time when it is impossible to walk upon the streets of this City without encountering the tragic and ever-present phenomenon of homelessness, and at a time when, according to former HPD Commissioner Crotty the City is already housing " 'as many homeless individuals in its shelters as it did at the height of the Great Depression' " (as cited in *Seawall Assocs. v City of New York,* 142 AD2d 72, 76, *supra),* it would seem that prudence alone would dictate that the displacing consequences of gentrification be carefully considered before embarking upon an extensive course of development. A "hard look" must, in any event, be given to the issue of secondary displacement by government decision-makers considering proposed actions such as the one at bar, if, for no other reason, than that the law requires it. As I am unable to join my colleagues in concluding that the decision-making agencies discharged their obligations in this very important respect, I respectfully dissent.

Accordingly, the order of the Supreme Court, New York County (David B. Saxe, J.), entered May 16, 1988, which granted defendants' motion for summary judgment dismissing the complaint, should be reversed to the extent of granting plaintiffs summary judgment as to their first, second, third, fourth, ninth, tenth, twelfth, thirteenth, fifteenth, sixteenth causes, and the project approvals by the Board of Estimate and the Community Planning Commission should be nullified.

KUPFERMAN and SULLIVAN, JJ., concur with ROSS, J.; MURPHY, P. J., and SMITH, J., dissent in a separate opinion by MURPHY, P. J.

Order, Supreme Court, New York County, entered on May 16, 1988, unanimously affirmed, without costs and without disbursements.